# 13-3819-cv(L)

## 13-3821-cv(CON)

IN THE

# United States Court of Appeals

### FOR THE SECOND CIRCUIT

◆ ◆

EM Ltd., NML Capital, Ltd.,

*Plaintiffs-Appellees,*

—against—

Banco Central de la República Argentina, Republic of Argentina,

*Defendants-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX FOR DEFENDANT-APPELLANT BANCO CENTRAL DE LA REPÚBLICA ARGENTINA

Joseph E. Neuhaus
Michael J. Ushkow
Zeh S. Ekono
Sullivan & Cromwell LLP
125 Broad Street
New York, New York 10004
(212) 558-4000

Jeffrey B. Wall
Sullivan & Cromwell LLP
1701 Pennsylvania Avenue, N.W.
Washington, DC 20006
(202) 956-7500

*Counsel for Defendant-Appellant
Banco Central de la República
Argentina*

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................1

STATEMENT OF JURISDICTION.......................................................3

STATEMENT OF THE ISSUES............................................................5

STATEMENT OF THE CASE AND THE FACTS................................6

      A.     Background .............................................................6

           1.     BCRA's Status and Activities....................................6

           2.     The Republic's Bond Issuance and Default..............8

           3.     The Plaintiffs' Parallel Litigation ...........................10

      B.     Procedural History...................................................11

           1.     Initial Attachment Proceeding and This Court's 2007 Decision .................................................11

           2.     Subsequent Attachment Proceeding and This Court's 2011 Decision ........................................12

           3.     Alter-Ego Proceeding on Remand ..........................17

SUMMARY OF ARGUMENT .............................................................20

STANDARD OF REVIEW ..................................................................23

ARGUMENT ......................................................................................24

I.     The District Court Erred in Holding that There Is Federal Jurisdiction Over This Suit.................................................24

      A.     The Republic's Waiver of its Own Immunity May Not Be Imputed to BCRA...............................................25

           1.     The Waiver Decision Below Is Inconsistent with This Court's Prior Decisions in This Case........................26

**TABLE OF CONTENTS**
(*continued*)

Page

2. The Supreme Court's Decision in *Bancec* and Principles of Agency Law Do Not Permit Jurisdiction. ...........................29

3. The Express Terms of the FAA Do Not Permit Jurisdiction. ................................................................35

B. The Republic's Failure to Repay its Debts and BCRA's Use of its FRBNY Account Are Not Commercial Activities that Form the Gravamen of Plaintiffs' Complaint. ...............................36

1. The Republic's Breach of the FAA Is Not the Gravamen of Plaintiffs' Complaint. ...........................................38

2. BCRA's Use of its FRBNY Account Is Not the Gravamen of Plaintiffs' Complaint...........................................40

C. This Action Is Not Justiciable Because It Is Wholly Speculative Whether a Declaratory Judgment Will Redress Plaintiffs' Alleged Injury....................................................43

II. The District Court Erred in Holding that Plaintiffs Have Adequately Pleaded that BCRA Is the Republic's Alter Ego for Any and All Purposes. ......................................................46

A. Plaintiffs Have Failed to Adequately Plead that the Republic Exercises Complete Control Over BCRA's Day-to-Day Operations. ........................................................46

1. The District Court Recognized that the Republic Does Not Exercise Complete Control Over BCRA's Day-to-Day Operations. ..................................................48

2. In Any Event, There Is No Plausible Basis for Concluding that the Republic Exercises Complete Control Over BCRA's Day-to-Day Operations.......................50

# TABLE OF CONTENTS
*(continued)*

Page

3.  Finding that BCRA Is an Alter Ego Based on Conduct
    Typical of Foreign Central Banks Would Do Serious
    Harm to This Nation's Interests................................................56

B.  Plaintiffs Have Failed to Adequately Plead that Recognizing
    BCRA's Separate Legal Status Would Work Fraud or Injustice........57

CONCLUSION ......................................................................................59

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Alejandre* v. *Telefonica Larga Distancia De Puerto Rico, Inc.*,
 183 F.3d 1277 ............................................................................58

*Aurelius Capital Partners, LP* v. *Republic of Argentina*,
 584 F.3d 120 (2d Cir. 2009),
 *cert. denied*, 130 S. Ct. 1691 (2010)........................................... 23-24

*Blue Ridge Investments, L.L.C.* v. *Republic of Argentina*,
 735 F.3d 72 (2d Cir. 2013) ...............................................................4

*Bridas S.A.P.I.C.* v. *Gov't of Turkmenistan*,
 447 F.3d 411 (5th Cir. 2006) ...........................................................31

*Bryant* v. *New York State Educ. Dep't*,
 692 F.3d 202 (2d Cir. 2012),
 *cert. denied*, 133 S. Ct. 2022 (2013)...............................................43

*Calderon* v. *Ashmus*,
 523 U.S. 740 (1998)........................................................................44

*Cargill Intern. S.A.* v. *M/T Pavel Dybenko*,
 991 F.2d 1012 (2d Cir. 1993) ..........................................................28

*Carpenter* v. *Republic of Chile*,
 610 F.3d 776 (2d Cir. 2010) .................................... 15-16, 26, 27, 28

*Chevron Corp.* v. *Naranjo*,
 667 F.3d 232 (2d Cir. 2012),
 *cert. denied*, 133 S. Ct. 423 (2012)..................................................45

*Cohen* v. *Beneficial Indus. Loan Corp.*,
 337 U.S. 541 (1949)..........................................................................3

*De Letelier* v. *Republic of Chile*,
 748 F.2d 790 (2d Cir. 1984) .......................................................46, 48

*Doe* v. *Holy See*,
 557 F.3d 1066 (9th Cir. 2009) ..................................................... 47-48

## TABLE OF AUTHORITIES
(*continued*)

**Page(s)**

*EM Ltd.* v. *Republic of Argentina*,
    473 F.3d 463 (2d Cir. 2007),
    *cert. denied*, 552 U.S. 818 (2007)...............................................................*passim*

*EM Ltd.* v. *The Republic of Argentina*,
    720 F. Supp. 2d 273 (S.D.N.Y. 2010) .........................................................*passim*

*Filler* v. *Hanvit Bank*,
    378 F.3d 213 (2d Cir. 2004) ...............................................................................15

*First Inv. Corp.* v. *Fujian Mawei Shipbuilding, Ltd.*,
    703 F.3d 742 (5th Cir. 2012) ..............................................................................47

*First Nat'l City Bank* v. *Banco Para El Comercio Exterior de Cuba*,
    462 U.S. 611 (1983).......................................................................................*passim*

*Foremost-McKesson, Inc.* v. *Islamic Republic of Iran*,
    905 F.2d 438 (D.C. Cir. 1990)......................................................................53, 54

*Gabay* v. *Mostazafan Foundation of Iran*,
    151 F.R.D. 250 (S.D.N.Y. 1993) ..................................................................31, 58

*Gen. Star Nat'l Ins. Co.* v. *Administratia Asigurarilor de Stat*,
    713 F. Supp. 2d 267 (S.D.N.Y. 2010) ...........................................................52, 53

*Gibbons* v. *Republic of Ireland*,
    532 F. Supp. 668 (D.D.C. 1982)..........................................................................31

*Gollomp* v. *Spitzer*,
    568 F.3d 355 (2d Cir. 2009) ...............................................................................24

*Hercaire Int'l, Inc.* v. *Argentina*,
    821 F.2d 559 (11th Cir. 1987) ...................................................................... 32-33

*Hester International Corp.* v. *Federal Republic of Nigeria*,
    879 F.2d 170 (5th Cir. 1989) ..............................................................................53

*Jenkins* v. *United States*,
    386 F.3d 415 (2d Cir. 2004) ....................................................................... 43-44

## TABLE OF AUTHORITIES
(*continued*)

**Page(s)**

*Kensington Int'l Ltd.* v. *Itoua*,
505 F.3d 147 (2d Cir. 2007) ...................................................21-22, 36-37, 41, 42

*Kensington Int'l Ltd.* v. *Republic of Congo*,
No. 03 Civ. 4758, 2007 WL 1032269 (S.D.N.Y. Mar. 30, 2007)...............34, 35

*LNC Invs., Inc.* v. *Republic of Nicaragua*,
115 F. Supp. 2d 358 (S.D.N.Y. 2000),
*aff'd sub nom. LNC Invs., Inc.* v. *Banco Central De Nicaragua*,
228 F.3d 423 (2d Cir. 2000) .........................................................................47, 54

*Lujan* v. *Defenders of Wildlife*,
504 U.S. 555 (1992)........................................................................ 43, 44-45

*McKesson Corp.* v. *Islamic Republic of Iran*,
52 F.3d 346 (D.C. Cir. 1995)................................................................................48

*Minpeco, S.A.* v. *Hunt*,
686 F. Supp. 427 (S.D.N.Y. 1988) .............................................................53, 58

*NML Capital, Ltd.* v. *Banco Central de la República Argentina*,
652 F.3d 172 (2d Cir. 2011),
*cert. denied*, 133 S. Ct. 23 (2012)...........................................................*passim*

*NML Capital, Ltd.* v. *Republic of Argentina*,
No. 09 Civ 7013, 2011 WL 524433 (S.D.N.Y. Feb. 15, 2011).........................53

*Oppenheimer & Co. Inc.* v. *Deutsche Bank AG*,
No. 09 Civ. 8154, 2010 WL 743915 (S.D.N.Y. Mar. 2, 2010) .........................51

*Petereit* v. *S.B. Thomas, Inc.*,
63 F.3d 1169 (2d Cir. 1995) ...............................................................................4

*Rein* v. *Socialist People's Libyan Arab Jamahiriya*,
162 F.3d 748 (2d Cir. 1998) ...............................................................................5

*Reiss* v. *Societe Centrale Du Groupe Des Assurances Nationales*,
235 F.3d 738 (2d Cir. 2000) ..............................................................................37

# TABLE OF AUTHORITIES
## (*continued*)

**Page(s)**

*Republic of Argentina* v. *Weltover, Inc.*,
    504 U.S. 607 (1992) ................................................................3

*Rogers* v. *Petroleo Brasileiro, S.A.*,
    673 F.3d 131 (2d Cir. 2012) ........................................... 3-4

*S & Davis Int'l, Inc.* v. *Republic of Yemen*,
    218 F.3d 1292 (11th Cir. 2000) ........................................31

*Saudi Arabia* v. *Nelson*,
    507 U.S. 349 (1993).............................................................36, 42

*Seijas* v. *Republic of Argentina*,
    502 F. App'x. 19 (2d Cir. 2012) ..........................23, 35, 47, 55

*Topp* v. *CompAir Inc.*,
    814 F.2d 830 (1st Cir. 1987)..............................................51

*Transamerica Leasing, Inc.* v. *La Republica de Venezuela*,
    200 F.3d 843 (D.C. Cir. 2000)...........................................53

*U.S. Fid. & Guar. Co.* v. *Braspetro Oil Servs., Co.*,
    199 F.3d 94 (2d Cir. 1999) ........................................ 4-5, 31

*United States* v. *Bestfoods*,
    524 U.S. 51 (1998)............................................................ 54-55

*Verlinden B.V.* v. *Cent. Bank of Nigeria*,
    461 U.S. 480 (1983)...........................................................25

*Walter Fuller Aircraft Sales, Inc.* v. *Republic of Philippines*,
    965 F.2d 1375 (5th Cir. 1992) ..........................................47

*Walters* v. *Indus. & Commer. Bank of China, Ltd.*,
    651 F.3d 280 (2d Cir. 2011) ..............................................29

*Whitmore* v. *Arkansas*,
    495 U.S. 149 (1990)...........................................................43

# TABLE OF AUTHORITIES
*(continued)*

**Page(s)**

**STATUTES AND RULES**

28 U.S.C. § 1291 ...................................................................................3

28 U.S.C. § 1330 ...................................................................................3

28 U.S.C. § 1602 ...................................................................................2

28 U.S.C. § 1603 ...................................................................................7

28 U.S.C. § 1604 ................................................................................3, 7

28 U.S.C. § 1605 ...........................................................................*passim*

28 U.S.C. § 1610 ............................................................................11, 14

28 U.S.C. § 1611 ...........................................................................*passim*

Fed. R. Civ. P. 12 ........................................................................4, 18, 24

**OTHER AUTHORITIES**

Black's Law Dictionary (9th ed. 2009) ................................................38

Ernest T. Patrikis, *Foreign Central Bank Property: Immunity from Attachment in the United States*, 1982 U. Ill. L. Rev. 265 (1982) ......................7

M.H. de Kock, Central Banking (4th Ed. 1974) ......................................7

Restatement (Third) of Agency § 7.01 (2006) .......................................32

U.S. Const., art. III, § 2 .........................................................................43

## INTRODUCTION

This is the third time that this case has been before this Court. Plaintiffs EM Ltd. and NML Capital, Ltd. are hedge funds headquartered in the Cayman Islands that specialize in distressed sovereign debt. They hold bonds that were issued, and defaulted on, by the Republic of Argentina ("Republic"). They have nevertheless spent the last eight years attempting to attach assets held not by the Republic but by its central bank, Banco Central de la República Argentina ("BCRA"). Plaintiffs began by twice trying to attach funds held by BCRA at the Federal Reserve Bank of New York ("FRBNY"), and this Court twice held those efforts barred by BCRA's foreign sovereign immunity. On remand from this Court's latest decision, no longer able to identify any specific fund for attachment, plaintiffs forged ahead with a far more radical request: a declaratory judgment that BCRA is the alter ego of the Republic, so that plaintiffs may attempt to attach *any asset held by BCRA anywhere in the world*.

Remarkably, the district court cleared the way for exactly that relief. The court said that there was jurisdiction over BCRA on a theory of waiver—even though this Court previously held that the bonds at issue waive only the Republic's immunity, not BCRA's immunity. The court below further found that there was jurisdiction because BCRA uses its FRBNY account to settle ordinary-course dollar transactions with Argentine banks—even though that activity in New York

has nothing to do with the gravamen of plaintiffs' alter-ego claim, as this Court's cases require.  The district court likewise concluded that plaintiffs' request for a declaratory judgment is justiciable—even though a judgment here is only meant as a possible prelude to some future litigation in some future forum.  And, finally, the court said that plaintiffs have pleaded a viable alter-ego case—even though plaintiffs have pointed only to commonplace conduct that is typical of many foreign central banks.  Simply put, BCRA is presumptively a separate juridical entity with its own immunity under the Foreign Sovereign Immunities Act of 1976 ("FSIA" or "Act"), 28 U.S.C. § 1602 *et seq.*, *see First Nat'l City Bank* v. *Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611 (1983) ("*Bancec"*), and plaintiffs have come nowhere close to rebutting that presumption.

The district court's ruling does far more than fly in the face of decisions of this Court and the Supreme Court.  It threatens grave harm to other foreign central banks, the national interest in attracting dollar reserves, and the international financial system generally.  Under the decision below, BCRA may be subjected to a declaratory judgment action, and declared the alter ego of a foreign state, based on activities that are commonplace among foreign central banks.  That holding is bound to give central banks serious pause in deciding whether to maintain or increase their holdings of foreign exchange reserves in the United States, which is contrary to the purposes of the FSIA and U.S. policy.

Accordingly, for a third and final time, this Court should reiterate that, whatever the frustration of the plaintiffs or the district court with the Republic's default, that is no cause to set aside BCRA's immunity from suit.

## STATEMENT OF JURISDICTION

Whether the district court had jurisdiction over this case is one of the issues presented on appeal. The FSIA provides that a foreign state and its instrumentalities are immune from suit in federal and state court, unless one of the Act's exceptions applies. *See* 28 U.S.C. §§ 1330, 1604; *Republic of Argentina* v. *Weltover, Inc*., 504 U.S. 607, 610-11 (1992). BCRA made a limited appearance through counsel before the district court to assert its immunity and to move to dismiss the complaint. The district court held, however, that two of the Act's exceptions apply because BCRA purportedly has waived its sovereign immunity, *see* 28 U.S.C. § 1605(a)(1), and has conducted commercial activity in the United States, *see id*. § 1605(a)(2). The district court announced its ruling from the bench on September 25, 2013, and entered an accompanying order the next day. BCRA timely appealed the district court's order to this Court on October 2, 2013.

This Court has jurisdiction over that order as a denial of foreign sovereign immunity. *See* 28 U.S.C. § 1291; *Cohen* v. *Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546-47 (1949); *Rogers* v. *Petroleo Brasileiro, S.A.*, 673 F.3d 131, 136 (2d Cir. 2012) ("[T]he collateral order doctrine . . . allows an immediate

3

appeal from an order denying immunity under the FSIA.") (internal quotation marks omitted); *see also Blue Ridge Invs., L.L.C.* v. *Republic of Argentina*, 735 F.3d 72, 81 (2d Cir. 2013) (holding that the denial of a motion to dismiss on grounds of foreign sovereign immunity is immediately appealable as a collateral order).

In addition, in adjudicating the appeal of the denial of foreign sovereign immunity, this Court has the authority and obligation to determine whether it lacks subject-matter jurisdiction. *See*, *e.g.*, *Petereit* v. *S.B. Thomas, Inc.*, 63 F.3d 1169, 1175 (2d Cir. 1995) ("A threshold matter . . . is whether we have jurisdiction. An inquiry respecting this issue is one we always have the power to undertake, and where jurisdiction is questionable we are obliged to examine it . . . ."), *cert. denied*, 517 U.S. 1119 (1996). Thus, a second issue presented on appeal is whether plaintiffs have failed to present a justiciable case or controversy under Article III because it is entirely speculative whether a declaratory judgment in this action will redress plaintiffs' alleged injury.

Finally, the Court has pendent jurisdiction over the denial of BCRA's motion to dismiss the complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), because, as explained below, the district court's jurisdictional ruling rested on, and is inextricably intertwined with, the plaintiffs' allegations that BCRA is the alter ego of the Republic of Argentina. *See, e.g., U.S.*

4

*Fid. & Guar. Co.* v. *Braspetro Oil Servs., Co.*, 199 F.3d 94, 97 (2d Cir. 1999) (pendent appellate jurisdiction exists "(a) where an issue is 'inextricably intertwined' with a question that is the proper subject of an immediate appeal, or (b) where review of a jurisdictionally insufficient issue is 'necessary to ensure meaningful review' of a jurisdictionally sufficient one") (quoting *Rein* v. *Socialist People's Libyan Arab Jamahiriya*, 162 F.3d 748, 757-58 (2d Cir. 1998) (internal quotation marks omitted)). It is necessary to review the district court's alter-ego ruling in order to ensure meaningful review of its jurisdictional holding in this case.

## STATEMENT OF THE ISSUES

1. Whether the district court erred in holding that it had jurisdiction over BCRA on the theory that (a) BCRA is an alter ego of the Republic such that the Republic's waiver of its own foreign sovereign immunity may be imputed to BCRA; (b) the Republic's failure to repay its debts and BCRA's use of its account at the FRBNY are commercial activities in the United States that form the gravamen of plaintiffs' complaint; and (c) plaintiffs' request for a declaratory judgment presents a justiciable case or controversy under Article III.

2. Whether the district court erred in holding that plaintiffs have alleged facts sufficient to overcome the presumption that BCRA is a separate

5

juridical entity and to state a claim that BCRA is the Republic's alter ego for any and all purposes.

## STATEMENT OF THE CASE AND THE FACTS

### A. Background

#### 1. BCRA's Status and Activities

BCRA was founded in 1935 as the central bank of the Republic of Argentina. *NML Capital, Ltd.* v. *Banco Central de la República Argentina*, 652 F.3d 172, 177 (2d Cir. 2011), *cert. denied*, 133 S. Ct. 23 (2012). By statute, it is "a self-administered institution" that is managed by an independent Board of Directors appointed by the National Executive Power with the consent of the national Senate. *Id.*; *EM Ltd.* v. *Republic of Argentina*, 473 F.3d 463, 479 n.15 (2d Cir.), *cert. denied*, 552 U.S. 818 (2007); A-3504.[1] As an independent legal entity under Argentine law, BCRA has the legal authority to, among other things, purchase and sell property in its own name, hold accounts in its own name, and sue and be sued in courts under its own name. *See EM Ltd.*, 473 F.3d at 479 n.15; A-3509-10, 3514, 3518 (Charter, arts. 18, 33, 55). BCRA is thus a "typical government instrumentality," *EM Ltd.*, 473 F.3d at 479 n.15, and is entitled both to

---

[1]     Citations to "A-" refer to the Joint Appendix and "SPA-" to the Special Appendix.

6

its own sovereign immunity, *see* 28 U.S.C. §§ 1603-1604, and to a presumption of separateness from the Republic, *see Bancec*, 462 U.S. at 626-27.

As the Republic's central bank, BCRA is "charged with acting as the Republic's financial agent and as depository and agent for the Republic before international monetary, banking, and financial entities, as well as with regulating the Argentine banking system and financial sector." *NML Capital, Ltd.*, 652 F.3d at 177; *see* Ernest T. Patrikis, *Foreign Central Bank Property: Immunity from Attachment in the United States*, 1982 U. Ill. L. Rev. 265, 274 (1982); M.H. de Kock, Central Banking 14-15 (4th ed. 1974). BCRA is authorized, among other things, to "issu[e] banknotes and coins in the Argentine Nation" and "invest a portion of its external assets in deposits or any other interest[-]bearing transaction with any foreign banking institution." *NML Capital, Ltd.*, 652 F.3d at 177 (internal quotation marks and citation omitted).

Indeed, "[l]ike many central banks around the world, BCRA maintains a foreign central bank account at the FRBNY in which, among other things, it manages dollar-denominated reserve holdings." *NML Capital, Ltd.*, 652 F.3d at 177. BCRA is one of hundreds of foreign central banks and monetary authorities that maintain accounts at the FRBNY. *See id.* at 177 n.7. At the end of 2009, the balance of those central banks' accounts "totaled nearly $3 trillion, representing more than half of the worldwide U.S. dollar-denominated reserves."

*Id.* BCRA's activity at the FRBNY thus is typical of a foreign central bank: it maintains foreign exchange reserves to facilitate regulation of the Argentine currency (the peso) and to have cash on hand in the event of a crisis. A-732-34; A-940-43; A-4392-552; A-4723-25; A-4751-59; A-4838-47.

BCRA's directors must be qualified in monetary, banking, or finance-oriented law, and they are prohibited from serving as employees of the national government. A-3504. BCRA's Charter provides the Board of Directors with numerous powers, including regulating monetary and foreign exchange markets, determining interest rates, removing bank notes and coins from circulation, providing rules for BCRA's organization and management, appointing BCRA's deputy general managers, and preparing and submitting an annual budget for Congressional approval. A-3506-07. The Chairman of the Board—BCRA's Governor—is tasked with additional responsibilities, including supervising the enforcement of BCRA's Charter, other national laws, and Board resolutions, submitting an annual report to Congress, and attending sessions of certain Congressional committees. A-3504-05. The Board of Directors adopts resolutions according to a majority of votes of the members present. A-3505.

## 2. The Republic's Bond Issuance and Default

In 1994, the Republic issued bonds pursuant to a Fiscal Agency Agreement ("FAA"). That agreement identifies Bankers Trust Company—not

8

BCRA—as the fiscal agent for securities issued pursuant to its terms, including the bonds held by plaintiffs. *See* A-284. BCRA was not a party to the FAA and had no connection to the issuance of those bonds. The FAA also provides that the Republic—not BCRA—waives its immunity as to "any suit, action, or proceeding against it or its properties, assets, or revenues with respect to the Securities . . . or the Fiscal Agency Agreement," as well as with respect to any action "brought solely for the purpose of enforcing or executing" a judgment obtained in a related proceeding. A-329-30. The waiver expressly states that it is "only a limited and specific waiver" by the Republic "for the purpose of the Securities . . . and the Fiscal Agency Agreement." A-330. "[U]nder no circumstances," the waiver states, "shall it be interpreted as a general waiver of the Republic or a waiver with respect to proceedings unrelated to the Securities . . . or the Fiscal Agency Agreement." A-330-31.

In 2001, Argentina was in the midst of the worst economic crisis in its history. A-952. As that financial crisis deepened, the Republic announced a moratorium on its debt service payments. *See EM Ltd.*, 473 F.3d at 466. It is undisputed that BCRA did not cause or participate in that 2001 default. In 2005 and 2010, the Republic successfully restructured over 91% of its debt through two voluntary exchange offers. *See NML Capital, Ltd.*, 652 F.3d at 176 n.4; A-3283;

A-3744; A-3759. Plaintiffs, however, elected not to restructure their debt and instead sought and obtained judgments against the Republic.

### 3.    The Plaintiffs' Parallel Litigation

In December 2005, plaintiffs pursued restraints against BCRA reserves held in its account at the FRBNY. They claimed that two emergency decrees issued by Argentina's President, which were meant to facilitate the Republic's repayment of debt to the International Monetary Fund ("IMF"), "had the effect of transferring ownership of certain BCRA assets, including the FRBNY [f]unds, from BCRA to the Republic." *See NML Capital, Ltd.*, 652 F.3d at 179. While that litigation was pending in September 2006, plaintiffs brought the present action against the Republic and BCRA, alleging that BCRA is liable for the Republic's debts as its alter ego. A-3027 (Third Amended Complaint ("TAC") ¶ 1). Plaintiffs contemporaneously pursued attachment orders against BCRA's FRBNY funds based on their alter-ego theory. *See NML Capital, Ltd.*, 652 F.3d at 181-82. In November 2006, the district court entered a stipulation and consent order extending BCRA's time to answer or otherwise respond to the complaint until after final resolution of the attachment proceeding. A-6.

10

**B.     Procedural History**

    **1.     Initial Attachment Proceeding and This Court's 2007 Decision**

In the initial attachment proceeding, plaintiffs did not challenge that BCRA is a separate juridical entity from the Republic. *See EM Ltd.*, 473 F.3d at 479. They argued that the IMF decrees had converted the FRBNY funds into attachable interests of the Republic. This Court rejected that argument, holding that the decrees did not transfer to the Republic any control over the FRBNY funds or any control over BCRA itself. *See id*. at 475-80. The Court further held that even if the FRBNY funds belonged to the Republic, they still would not be "property of the Republic 'used for a commercial activity in the United States.'" *Id*. at 480-82 (quoting 28 U.S.C. §§ 1610(a) and (d)). The Court reasoned that "[t]he Republic's borrowing relationship with the IMF, and the repayment obligations assumed thereunder," were an exercise of sovereign power rather than ordinary commercial activity. *Id*. at 482-84. The Court further observed that there was "little support" for plaintiffs' argument that the Republic had waived BCRA's immunity from attachment because the Republic's waiver of its own immunity "does not appear to clearly and unambiguously waive BCRA's immunity, as it must do in order to be effective." *Id*. at 485 n.22.

### 2. Subsequent Attachment Proceeding and This Court's 2011 Decision

a. In the second attachment proceeding, plaintiffs did challenge BCRA's status as a separate juridical entity. They argued that "the Republic's consistent disregard for BCRA's independence had vitiated any presumption of separateness to which BCRA was entitled, transforming . . . BCRA into an alter ego of the Republic." *NML Capital, Ltd.*, 652 F.3d at 181. In an April 2010 opinion, the district court agreed and granted plaintiffs' attachment motions. *See EM Ltd.* v. *The Republic of Argentina*, 720 F. Supp. 2d 273 (S.D.N.Y. 2010). The court recognized that "there has been no waiver of immunity with respect to BCRA either by the bank itself or by the Republic on BCRA's behalf." *Id.* at 297. The court further recognized that, under the Supreme Court's decision in *Bancec*, "there is a presumption that an instrumentality established by a foreign government is to be accorded separate legal status." *Id.* at 298 (citing *Bancec*, 462 U.S. at 628).

The district court, however, determined that the *Bancec* presumption had been rebutted in this case. The court did not find that the Republic exercised complete control over BCRA or that BCRA was the alter ego of the Republic for all purposes, as plaintiffs had alleged. Indeed, the court expressly noted that "[t]he Republic did not manage the day-to-day operations of BCRA" and "[i]t did not manage the routine transactions regarding Argentine pesos and foreign currency." *EM Ltd.*, 720 F. Supp. 2d at 299.

12

Instead, the district court relied on "the Republic's use of resources of BCRA in 2005 to pay the debt owed to the IMF." *EM Ltd*., 720 F. Supp. 2d at 299. According to the court, the Republic had directed BCRA to acquire U.S. dollar reserves and to use a portion of those reserves as payment for the Republic's debt to the IMF. *See id*. at 299-300. In the court's view, "[t]his demonstrated that the Republic could draw on the resources of BCRA at will." *Id*. at 300.[2] The court therefore concluded that "the presumption of separateness is overcome" and "BCRA was the servant or the agent of the Republic as to its funds, within the meaning of" *Bancec*. *Id*. The court then went further and stated that it would work a "fraud or injustice" not to disregard the *Bancec* presumption, because the Republic had purportedly demonstrated "bad faith" in failing to pay bondholders who did not participate in the restructuring. *Id*. at 300-01.

Having reasoned that the FRBNY funds were property of the Republic rather than BCRA, the district court determined that the funds were "used for a

---

[2]    In reaching that conclusion, the district court ignored BCRA's extensive evidence—from both fact and expert witnesses, as well as official government publications—explaining why BCRA and other foreign central banks had implemented a policy of accumulating foreign exchange reserves. The court relied instead on four press reports and editorials, including publications from Argentina's highly partisan press. *See, e.g*., *EM Ltd.*, 720 F. Supp. 2d at 284-85, 299-300. The court relied on that hearsay despite its recognition that "the facts may be contested." *Id*. at 280.

commercial activity in the United States" within the meaning of the FSIA. 28 U.S.C. §§ 1610(a) and (d). The court's determination rested on the fact that the funds were held in an interest-bearing account at the FRBNY. *See EM Ltd*., 720 F. Supp. 2d at 303. The court then rejected defendants' argument that the funds were immune from attachment under a separate provision of the FSIA, 28 U.S.C. § 1611(b)(1), which bars attachment of property "of a foreign central bank or monetary authority held for its own account" absent an explicit waiver. *See EM Ltd*., 720 F. Supp. 2d at 303. As a result, the court granted plaintiffs' attachment motions. *See id*. at 304.

   b.   On appeal, both the United States and the FRBNY participated as *amici curiae*, warning that the district court's decision would have far-reaching negative consequences for hundreds of foreign central banks, the national interest in attracting dollar reserves, and the international financial system generally. *See* A-3550-51 (U.S. Amicus Br.); A-3551 ("[T]he United States has an interest in protecting foreign central banks engaged in central banking activities from interference by unwarranted litigation in U.S. courts."); *see* Brief of Amicus Curiae the Federal Reserve Bank of New York at 9-10, *NML Capital, Ltd.* v. *Banco Central de la República Argentina*, 652 F.3d 172 (2d Cir. 2011) (No. 10-1487-cv(L)) ("FRBNY Amicus Br."). Both the United States and the FRBNY argued that attachment of the FRBNY funds was barred by the plain language of Section

1611(b)(1), because those funds were held by BCRA for its own account—without regard to the relationship between BCRA and the Republic. *See* A-3551; FRBNY Amicus Br. 14.

This Court agreed and again held that the FSIA barred attachment of BCRA's funds at the FRBNY. The Court reasoned that "the plain language, history, and structure of § 1611(b)(1) immunize[] property of a foreign central bank or monetary authority held for its own account without regard to whether the bank or authority is independent from its parent state pursuant to *Bancec*." *NML Capital, Ltd.*, 652 F.3d at 187-88. The Court then determined that the FRBNY funds were in fact property held by BCRA for its own account, because "the accumulation of foreign exchange reserves to facilitate the regulation of the peso and the custody of cash reserves of commercial banks pursuant to central bank regulations are paradigmatic central banking functions." *Id*. at 195 ("'[P]rotecting depositors and promoting financial stability' are 'functions traditionally performed by the government' in the context of an instrumentality's immunity under FSIA.") (quoting *Filler* v. *Hanvit Bank*, 378 F.3d 213, 217 (2d Cir. 2004)).

The Court recognized that the FRBNY funds were therefore immune from attachment unless BCRA had "waived its immunity." 28 U.S.C. 1611(b)(1). This Court held that it had not. It observed that "[w]aiver under the FSIA must be 'clear and unambiguous.'" *NML Capital, Ltd*., 652 F.3d at 195 (quoting *Carpenter*

15

v. *Republic of Chile*, 610 F.3d 776, 779 (2d Cir. 2010)). The Court reasoned that although the terms governing the bonds at issue "waive[] immunity under the FSIA for 'the Republic or any of its revenues, assets or property,' the Republic's waiver did not mention the 'instrumentalities' of the Republic or BCRA in particular, much less BCRA's reserves at FRBNY." *Id*. at 196. The Court concluded that, as it had previously observed, the Republic's waiver "does not appear to clearly and unambiguously waive BCRA's immunity from attachment, as it must do in order to be effective." *Id*. (quoting *EM Ltd*., 473 F.3d at 485 n.22). The Court thus vacated the district court's attachment orders.

           c. Because the Court held that Section 1611(b)(1) barred attachment, it did not need to reach the question of whether BCRA is the alter ego of the Republic. Notably, however, the United States argued that "the district court's analysis of the 'alter ego' issue was also flawed." A-3551-52. The United States explained that "BCRA's alleged involvement in repaying the Republic's debts to the IMF" was not evidence of an alter-ego relationship because, among other reasons, "central banks commonly perform payment functions for their governments, including central banks that are relatively independent from their governments." A-3552, 3569. Moreover, the United States questioned whether other types of conduct—like "a foreign state's involvement in the decision of its central bank to increase its U.S. dollar reserves" or "a central bank's payment of

debt to creditors other than the IMF"—could show "a foreign state's day-to-day control over central bank operations." A-3570-71 n.*. "[C]entral banks ordinarily have a high degree of interaction with their parent foreign governments," the United States observed, and "courts should give significant deference to a foreign government's conduct vis-à-vis its central bank." A-3571 n.*.

### 3. Alter-Ego Proceeding on Remand

On remand, plaintiffs filed the Third Amended Complaint now at issue, A-3026-83, requesting a declaratory judgment that BCRA is an alter ego of the Republic and, as such, is liable for the Republic's debts, A-3027 (TAC ¶ 1).[3] Plaintiffs maintain that during the period since the Republic defaulted on their bonds in 2001, it has exercised certain elements of control over BCRA's funds and personnel. Specifically, plaintiffs allege the following conduct, all of which occurred exclusively in Argentina: starting in 1999, but mostly between 2002 and 2012, the Republic's National Congress and President made it easier for the Republic to borrow funds from Argentine banks and BCRA, A-3036-39 (TAC ¶¶ 33-35); between 2005 and 2010, BCRA lent funds in Argentina to the Republic,

---

[3]     Another group of hedge funds had a similar alter-ego complaint pending against BCRA and the Republic. After this Court's decision in *NML Capital*, those plaintiffs voluntarily dismissed their complaint. *See* Notice of Voluntary Dismissal, *Aurelius Capital Partners, LP* v. *Banco Central de la República Argentina* (July 26, 2012) (No. 10 Civ. 3059, Dkt No. 12).

which used those funds to repay other creditors, A-3039-56 (TAC ¶¶ 36-75); between 2001 and 2012, there was a high turnover rate of BCRA's Governors, A-3056-66 (TAC ¶¶ 76-96); and beginning in late 2004, the Republic and BCRA coordinated concerning monetary policy, A-3066-76 (TAC ¶¶ 97-113).

In November 2012, BCRA and the Republic each moved to dismiss the complaint for lack of subject matter and personal jurisdiction and for failure to state a claim for which relief may be granted, pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(2), and 12(b)(6).  A-3084-85; A-3496-97.  At a conference in September 2013, the parties argued those motions.  Plaintiffs explained that they want a declaratory judgment that BCRA is an alter ego of the Republic for any and all purposes, so that they may attempt to attach any asset of BCRA anywhere in the world.  *See* SPA-4 (9/25/13 Tr. 3:21-23) ("We would like to be able to have a judgment that holds BCRA liable for the judgments entered against Argentina that we may enforce as a judgment if we find assets anywhere."), 10-13 (9/25/13 Tr. 9:10-12:15) (arguing that plaintiffs could take the declaratory judgment to Switzerland or Germany and use it to attach BCRA's assets).  But BCRA submitted extensive evidence—including declarations of English, German and French law, as well as a decision of a Swiss court—showing that foreign courts are highly unlikely to permit plaintiffs to enforce an alter-ego declaration obtained in this action against assets that BCRA may hold in those respective

18

jurisdictions. *See* A-3088-120 (Switzerland); A-3121-32 (France); A-3221-32 (England); A-3390-99 (Germany).

Plaintiffs argued two grounds for jurisdiction over BCRA. First, plaintiffs contended that "immunity was waived in the FAA by Argentina" and "if BCRA is the alter ego of Argentina, that waiver applies to BCRA." SPA-27-28 (9/25/13 Tr. 26:24-27:1). Second, plaintiffs contended that BCRA engages in "commercial activity" in New York because the Republic (not BCRA) breached "a fiscal agency agreement governed by New York law, subject to jurisdiction in New York, . . . [and] payable by a fiscal agent in New York." SPA-29-30 (9/25/13 Tr. 28:22-25). Plaintiffs also contended that BCRA engages in commercial activity through its "account at the [FRBNY]," which BCRA uses "to gather dollars that are used to repay debt to others and not to [plaintiffs]." SPA-30 (9/25/13 Tr. 29:5-14). According to plaintiffs, "those activities by BCRA" are the "gravamen" of their alter-ego claim. SPA-30-31 (9/25/13 Tr. 29:24-30:2). Plaintiffs thus argued that the district court had jurisdiction "both on the waiver of immunity that's imputed to BCRA and on BCRA's activities in [New York] which are the gravamen of [their] complaint." SPA-31 (9/25/13 Tr. 30:3-7).

The district court (Griesa, J.) accepted those arguments without elaboration. SPA-32 (9/25/13 Tr. 31:20-22) ("[T]here is jurisdiction in the way Mr. Cohen describes jurisdiction."). The court concluded that "there is an implied

19

waiver here" and "there's commercial activity," meaning "that the provisions of 28 U.S.C. 1605(a)(1) and (a)(2) are applicable." SPA-32-33 (9/25/13 Tr. 31:24-32:1). Turning to the merits, the court declared: "[T]he assets of BCRA in a general way cannot, in my view, be said to be applicable to the judgment debts of plaintiffs here." SPA-32 (9/25/13 Tr. 31:6-8). Indeed, the court observed, "the idea that BCRA is in a general way liable for the debts of the Republic goes way too far." SPA-31-32 (9/25/13 Tr. 30:22-31:2). The court nevertheless went on to conclude that plaintiffs had pleaded a claim "that for certain purposes BCRA is the alter ego of the [R]epublic." SPA-33 (9/25/13 Tr. 32:15-18). In the court's view, a ruling to that effect could be "used in a proceeding in another state or a foreign country" to attach BCRA's assets. SPA-33-34 (9/25/13 Tr. 32:15-18, 32:23-33:6). The court accordingly denied BCRA's and the Republic's motions to dismiss. SPA-34 (9/25/13 Tr: 33:7). This appeal timely followed.

## SUMMARY OF ARGUMENT

I.    The district court erred in holding that there is federal subject-matter jurisdiction over this suit. There is not jurisdiction under the FSIA, and, in any event, the case is not justiciable under Article III.

A.    The Republic's waiver of sovereign immunity in the FAA may not be imputed to BCRA. This Court already found in both of its previous decisions in this case that the FAA waives only the immunity of the Republic, not

BCRA. Even on a blank slate, plaintiffs have failed to overcome the *Bancec* presumption that BCRA is a separate juridical entity, and thus they may not attribute any of the Republic's conduct to BCRA. And even if plaintiffs had overcome that presumption, it is black-letter agency law that they could attribute only conduct by the Republic in which BCRA had some involvement. No court has ever adopted plaintiffs' novel theory of reverse-imputation: that a parent state's conduct may be attributed to an instrumentality with no role in the conduct whatsoever. Moreover, even imputing the Republic's waiver to BCRA would not result in jurisdiction, because that waiver does not cover this action by its terms.

B. Nor are the Republic's failure to pay its debts and BCRA's use of its FRBNY account commercial activities that form the gravamen of plaintiffs' complaint. The core of plaintiffs' complaint is that, based on *post-default* events *in Argentina*, BCRA should be deemed the alter ego of the Republic for any and all purposes. That plainly has nothing to do with the Republic's default on its debt in 2001, years earlier than substantially all of the conduct alleged in the complaint. And it also has nothing to do with whether BCRA used an account at the FRBNY. Both of those circumstances—the Republic's default and BCRA's maintaining an account in New York—are merely incidental to the alleged alter-ego conduct. This Court reached the same conclusion on similar facts in *Kensington Int'l, Ltd.* v.

21

*Itoua*, 505 F.3d 147 (2d Cir. 2007), and there is no reason for a different result here.

C.    Moreover, this action is not justiciable because it is wholly speculative whether a declaratory judgment will redress plaintiffs' alleged injury. Plaintiffs want an alter-ego declaration in the event that they ever locate non-immune, attachable assets somewhere in the world.   But plaintiffs have not identified such assets, and BCRA submitted extensive evidence below that they are unlikely to do so.   The immunity of central bank property is generally greater outside the United States, and thus it is exceedingly improbable that plaintiffs could enforce an alter-ego declaration obtained in this action against BCRA assets in other jurisdictions.   Even if plaintiffs could identify non-immune, attachable assets elsewhere, the practical effect of a judgment here still would depend on the outcome of possible future litigation in other fora—and plaintiffs have not shown that there is any bar to litigating the alter-ego question in those other proceedings.

II.    The decision below is incorrect for an additional reason that independently requires reversal:   plaintiffs have not alleged sufficient facts to overcome the *Bancec* presumption that BCRA is a separate juridical entity and to state a claim that BCRA is the Republic's alter ego for any and all purposes.

A.    The district court acknowledged that the Republic does not exercise complete control over BCRA's day-to-day operations.   Under this Court's

case law, that should have been the end of the matter. In any event, plaintiffs' allegations do not plausibly allege such control. At most, they allege nothing more than ordinary interaction between a foreign central bank and its parent government. Indeed, plaintiffs' allegations are strikingly similar to those this Court found insufficient in *Seijas* v. *Republic of Argentina*, 502 F. App'x. 19 (2d Cir. 2012).

B. Finally, plaintiffs have failed to adequately plead that recognizing BCRA's separate legal status would work a fraud or injustice. Plaintiffs have alleged that it would be a fraud or injustice to permit BCRA to invoke its separate status when the Republic has repaid creditors other than plaintiffs. Courts have repeatedly held, however, that it is not a fraud or injustice for *Bancec* purposes for a foreign instrumentality to invoke the protections and immunities expressly granted to it by Congress. And if a parent state's nonpayment of creditors, repayment of only some creditors, or breach of contractual provisions were "fraud or injustice" under *Bancec*, the presumption that *Bancec* established would be effectively meaningless.

## STANDARD OF REVIEW

The district court's rulings with respect to both jurisdiction and the merits are reviewed *de novo*. *See*, *e.g.*, *Aurelius Capital Partners, LP* v. *Republic of Argentina*, 584 F.3d 120, 129 (2d Cir. 2009) ("We review *de novo* legal conclusions denying [Foreign Sovereign Immunities] Act immunity to a foreign

state or its property."), *cert. denied*, 130 S. Ct. 1691 (2010); *Gollomp* v. *Spitzer*, 568 F.3d 355, 365 (2d Cir. 2009) ("We review *de novo* a district court's grant or denial of a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.").

## ARGUMENT

The district court erred in holding both that plaintiffs established jurisdiction over BCRA and that they alleged sufficient facts to state a claim that the bank is an alter ego of the Republic for any and all purposes. Each of the district court's legal errors independently requires reversal. Although BCRA should never have been subject to this suit at all, it is now faced with lengthy discovery and the prospect of a declaratory judgment that will be used to attempt attachment of any of its assets, anywhere in the world. The repercussions of that ruling, if affirmed, will be immediate and unfortunate. As the United States cautioned the last time this case was before this Court, the decision below threatens serious harm to hundreds of foreign central banks, the ability of this country to attract and keep dollar reserves, and reciprocal principles of immunity that are critical to the proper functioning of the international financial system.

## I. The District Court Erred in Holding that There Is Federal Jurisdiction Over This Suit.

BCRA is an instrumentality of the Republic and thus entitled to foreign sovereign immunity under the FSIA unless one of the Act's exceptions

applies. *See*, *e.g.*, *Verlinden B.V.* v. *Cent. Bank of Nigeria*, 461 U.S. 480, 485 n.5 (1983); SPA-27 (9/25/13 Tr. 26:20-21); A-3029 (TAC ¶ 10). The district court held that two of the Act's exceptions apply: first, if BCRA is shown to be an alter ego of the Republic, then the Republic's waiver of its own foreign sovereign immunity would be imputed to BCRA, *see* 28 U.S.C. § 1605(a)(1); and, second, the Republic's failure to repay its debts and BCRA's use of its account at the FRBNY would constitute commercial activity in the United States, *see id*. § 1605(a)(2). Neither rationale withstands serious scrutiny. In addition, the district court erred in concluding that plaintiffs' request for a declaratory judgment presents a justiciable controversy, on the theory that plaintiffs may someday attempt to use that judgment in some future action in some other forum in order to reach unspecified BCRA assets.

## A. The Republic's Waiver of its Own Immunity May Not Be Imputed to BCRA.

The FSIA provides that a foreign sovereign is not immune from jurisdiction if it "has waived its immunity either explicitly or by implication." 28 U.S.C. § 1605(a)(1). Here, plaintiffs argued that BCRA's "immunity was waived in the FAA by Argentina" and "if BCRA is the alter ego of Argentina, that waiver applies to BCRA." SPA-27-28 (9/25/13 Tr. 26:24-27:1). The district court accepted that line of reasoning. SPA-32 (9/25/13 31:20-22) ("I believe there is jurisdiction in the way Mr. Cohen describes jurisdiction."). The court therefore

25

concluded that "there is an implied waiver here" and "[Section] 1605(a)(1) . . . [is] applicable."  SPA-32-33 (9/25/13 Tr. 31:24-32:1).

> ### 1.   The Waiver Decision Below Is Inconsistent with This Court's Prior Decisions in This Case.

There are a number of problems with that implied waiver theory, the most obvious of which is that this Court has twice found that it is incorrect.  In both *EM Ltd.* and *NML Capital*, this Court concluded that the FAA waives *only* the Republic's immunity, *not* BCRA's immunity.   The FAA provides that the Republic—not BCRA—waives its immunity as to "any suit, action, or proceeding against it or its properties, assets, or revenues with respect to the Securities . . . or the Fiscal Agency Agreement," as well as with respect to any action "brought solely for the purpose of enforcing or executing" a judgment obtained in a related proceeding.  A-329-30.  BCRA was not a party to the FAA and had no connection to the issuance of FAA-related bonds.

Of greatest significance, in *NML Capital*, plaintiffs contended (as they do again here) that BCRA was an alter ego of the Republic, which had waived BCRA's immunity from attachment.  This Court disagreed with plaintiffs' waiver contention and thus did not need to reach their alter-ego contention.  The Court recognized that "[w]aiver under the FSIA must be 'clear and unambiguous.'"  *NML Capital, Ltd.*, 652 F.3d at 195 (quoting *Carpenter*, 610 F.3d at 779).  It observed that although the FAA's terms "waive[] immunity under the FSIA for

'the Republic or any of its revenues, assets or property,' the Republic's waiver [does] not mention the 'instrumentalities' of the Republic or BCRA in particular." *Id*. at 196 (quoting A-330). And the Court noted that when it had recognized "the waiver of immunity with respect to an agency or instrumentality of a foreign state, that waiver has specifically embraced the foreign state *and* the relevant agency or instrumentality." *Id*. at 195-96 (emphasis in original). The Court therefore concluded that, as it had observed in *EM Ltd.*, the FAA waives only the Republic's immunity, not BCRA's immunity. *Id*. ("As we previously observed, [the Republic's waiver] 'does not appear to clearly and unambiguously waive BCRA's immunity from attachment, as it must do in order to be effective.'") (quoting *EM Ltd.*, 473 F.3d at 485 n.22).

Although the Court reached that conclusion with respect to Section 1611(b)(1) of the FSIA, it applies equally here with respect to Section 1605(a)(1). The question under either provision is whether BCRA has clearly and unambiguously waived its immunity, and this Court held in both *EM Ltd.* and *NML Capital* that the FAA does not constitute such a waiver. Indeed, although this Court in *NML Capital* was interpreting Section 1611, it relied on case law applying waiver principles in the context of Section 1605, precisely because both provisions require a clear and unambiguous waiver. Specifically, the Court in *NML Capital* relied on *Carpenter* v. *Republic of Chile*, 610 F.3d 776 (2d Cir. 2010), which

27

addressed claims of waiver under Section 1605(a). *See NML Capital, Ltd*., 652 F.3d at 195-196; *see also Carpenter*, 610 F.3d at 779.

To be sure, Section 1605(a)(1) is broader in a sense: it permits waiver "either explicitly or by implication," whereas Section 1611(b)(1) requires an "explicit[]" waiver. But even an implied waiver must still be clear and unambiguous from a foreign state's or instrumentality's conduct. The FSIA's legislative history explains that a waiver may be inferred when "(1) a foreign state has agreed to arbitrate in another country; (2) a foreign state has agreed that the law of a particular country shall govern; or (3) a foreign state has filed a responsive pleading but has failed to raise the defense of sovereign immunity." *Cargill Int'l S.A*. v. *M/T Pavel Dybenko*, 991 F.2d 1012, 1017 (2d Cir. 1993). In those circumstances, the foreign sovereign's conduct makes clear that it intends to submit itself to the jurisdiction of courts, even absent an express waiver.

Neither the district court nor plaintiffs, however, have pointed to anything like that here. BCRA has done nothing to show that it consents to being hauled into federal court in New York to answer for the Republic's debts. BCRA did not assent to a choice-of-forum or choice-of-law clause in the FAA—because it was not a party to that agreement and had no connection to the issuance of any bonds thereunder. And BCRA did not assent to jurisdiction through its conduct in this litigation—because it appeared below for the limited purpose of asserting its

foreign sovereign immunity, as it has through the course of this litigation for the last eight years. Simply put, this Court has found an implied waiver only when there is "an affirmative indication of a conscious decision by the foreign sovereign" to relinquish its jurisdictional immunity, *Walters* v. *Indus. & Commer. Bank of China, Ltd.*, 651 F.3d 280, 296 (2d Cir. 2011), and BCRA has given no such affirmative indication here.

### 2. The Supreme Court's Decision in *Bancec* and Principles of Agency Law Do Not Permit Jurisdiction.

Before the district court, plaintiffs did not even attempt to establish an express or implied waiver based on BCRA's own conduct. Rather, they argued (and the district court adopted) a different and novel theory: that the Republic's express waiver may be *imputed* to BCRA because the Republic's conduct has rendered BCRA its alter ego. That theory of reverse-imputation—*i.e.*, imputation of a parent state's conduct to its instrumentality—is impermissible here for two reasons. First, in order to impute any of the Republic's conduct to BCRA, plaintiffs would have to overcome the *Bancec* presumption that BCRA is a separate juridical entity. As explained below in Part II, plaintiffs have failed to allege that the Republic exercises domination and control over BCRA, and thus they have failed to state an alter-ego claim under *Bancec*. Second, assuming for the moment that *Bancec*'s prerequisites were satisfied, that would only allow plaintiffs to disregard BCRA's separate status *if BCRA were effectively acting as*

29

*the Republic's agent with respect to the wrongful conduct at issue* (*i.e.*, the Republic's nonpayment of debt). Plaintiffs have alleged no such involvement by BCRA in the Republic's default.

In *Bancec* itself, the Cuban government seized property held by Citibank. *See* 462 U.S. at 614. A Cuban instrumentality (Bancec) later brought suit against Citibank on a letter of credit, and shortly thereafter the Cuban government dissolved Bancec and took charge of its assets. *See id.* at 615. The question was whether Citibank could bring a counterclaim for the government's seizure of its property, notwithstanding that Bancec had been established as a separate juridical entity. *See id.* at 616. The Supreme Court held that in light of Bancec's dissolution and the transfer of its assets to the government, the Cuban government was effectively acting through Bancec as its agent and thus Citibank should have recourse against Cuba as the controlling principal and real beneficiary of the suit. *See id.* at 629 ("[W]here a corporate entity is so extensively controlled by its owner that a relationship of principal and agent is created, we have held that one may be held liable for the actions of the other."); *id.* at 632 ("Giving effect to Bancec's separate juridical status . . . would permit the real beneficiary of such an action, the Government of the Republic of Cuba, to obtain relief in our courts that it could not obtain in its own right without waiving its sovereign immunity and answering for the seizure of Citibank's assets.").

30

In *Bancec*, the parent state dominated and controlled the instrumentality with respect to the conduct at issue. That is the typical case: an agency or instrumentality controlled by the parent state engages in allegedly wrongful conduct, and that conduct is then imputed to the controlling parent state. *See*, *e.g.*, *Bridas S.A.P.I.C.* v. *Gov't of Turkmenistan*, 447 F.3d 411, 420 (5th Cir. 2006) (liability for breach of contract shifted from state-owned oil company to controlling parent government); *S & Davis Int'l, Inc.* v. *Republic of Yemen*, 218 F.3d 1292, 1299-300 (11th Cir. 2000) (government ministry's control of state-owned corporation gave rise to jurisdiction over the ministry and parent government by virtue of the state-owned corporation's activities); *U.S. Fid. & Guar. Co.*, 199 F.3d at 98 (commercial activity by oil company attributed to controlling government-owned corporation); s*ee also Gabay* v. *Mostazafan Found. of Iran*, 151 F.R.D. 250, 254-55 (S.D.N.Y. 1993) ("When a plaintiff grounds the 'commercial activity' exception on an alter-ego theory, courts have quite naturally required the alleged alter ego to be directly involved in the wrong done to plaintiff."); *Gibbons* v. *Republic of Ireland*, 532 F. Supp. 668, 671 (D.D.C. 1982) (sovereign subject to suit for actions of instrumentality "only where representatives of the sovereign participated at least to some degree in the events giving rise to the action"). In that situation, "where a corporate entity is so extensively controlled by its owner that a relationship of principal and agent is created," general principles of

agency law indicate that "one may be held liable for the actions of the other." *Bancec*, 462 U.S. at 629.

But that is the exact opposite of this case. Here, plaintiffs do not want to impute BCRA's conduct to the Republic. Rather, they want to impute *the Republic's conduct to BCRA*. That type of reverse-imputation is virtually unknown to the law. Plaintiffs have not pointed to any decision of this Court or of any other court of appeals finding jurisdiction on a reverse-imputation theory. The reason is that such a theory is squarely inconsistent with bedrock principles of agency law. An agent can only be held responsible for *its own misconduct*—not a principal's misconduct in which the agent played no role. *See, e.g.,* Restatement (Third) of Agency § 7.01 (2006) ("An agent is subject to liability to a third party harmed by *the agent's* tortious conduct.") (emphasis added); *id.* § 7.01 cmt. d ("Only an agent's own tortious conduct subjects the agent to liability under this rule. An agent is not subject to liability for torts committed by the agent's principal that do not implicate the agent's own conduct; there is no principle of 'respondeat inferior.'"). A foreign agency or instrumentality thus cannot be made to face suit for a foreign state's conduct in which it played absolutely no part. *See, e.g., Hercaire Int'l, Inc.* v. *Argentina*, 821 F.2d 559, 565 (11th Cir. 1987) ("Having had no connection whatsoever with the underlying transaction which gives rise to

Argentina's liability, it would be manifestly unfair to subject Aerolineas' assets to such attachment.").

This case is a perfect example. It is undisputed here that BCRA had no involvement in the Republic's waiver of its own immunity in the FAA. Nor did BCRA even have any involvement in the Republic's issuance of, or default on, the bonds at issue. Plaintiffs' complaint against BCRA focuses almost entirely on conduct by the Republic that occurred *after* the default and that *bears no direct connection* to the default itself. *See* A-3036-39 (TAC ¶¶ 33-35) (executive decrees and amendments to Argentine laws that allegedly increase the Republic's borrowing from Argentine banks and BCRA, mostly between 2002 and 2012), 3039-56 (TAC ¶¶ 36-75) (BCRA's lending of funds to the Republic between 2005 and 2010), 3056-66 (TAC ¶¶ 76-96) (turnover rate of BCRA's Governors between 2001 and 2012), 3066-76 (TAC ¶¶ 97-113) (the Republic and BCRA's coordination concerning monetary policy as of late 2004). There is simply no basis in law or logic for subjecting BCRA to suit because the Republic waived its own immunity and then defaulted on its own bonds—when BCRA had no involvement in either that 1994 waiver or that 2001 default. That is true regardless of what has happened since: it is the Republic's 1994 waiver (or, at most, its 2001 default on debt governed by the FAA) that plaintiffs want to impute, and later events could not make BCRA a party to that earlier waiver (or default).

33

Plaintiffs have pointed to a single unpublished district court decision in support of their reverse-imputation theory. *See Kensington Int'l Ltd.* v. *Republic of Congo*, No. 03 Civ. 4758, 2007 WL 1032269 (S.D.N.Y. Mar. 30, 2007). But even that case did not depend on any novel principle of reverse-imputation. In *Kensington*, the Congo created a wholly-controlled oil company and then engaged in "unnecessarily complex transactions and charades for purposes of confounding its creditors." *Id.* at *8-9; *see id.* at *16 ("[I]t would be unfair to allow Congo . . . [to transfer] its most valuable and available assets to a newly formed instrumentality that Congo controls and uses to engage in complicated transactions for the specific purpose of insulating its assets from lawful creditors . . . ."). Thus, the instrumentality in *Kensington* was not only deeply involved in the parent state's allegedly wrongful conduct, but it had been created for the very purpose of enabling that conduct. As a result, there was no occasion in *Kensington* to determine whether a foreign agency or instrumentality can be made to answer for a foreign state's conduct in which it was not involved.

This case is nothing like *Kensington*. BCRA has been in existence since 1935 and it had no involvement at all in the Republic's default on plaintiffs' securities. Unlike in *Kensington*, BCRA is administered by an independent Board of Directors. *See EM Ltd.*, 473 F.3d at 479 n.15. It also has been completely forthcoming in this litigation by providing detailed accounts of the way in which

34

BCRA settles transactions through its FRBNY account. *E.g.*, A-4716-47. That transparency has not produced any evidence, as there was in *Kensington*, that the Republic commingles its assets with BCRA's. *See Kensington*, 2007 WL 1032269, at *10-12. Indeed, this Court has twice held that the Republic does not have a property interest in the funds that BCRA holds in its FRBNY account. *See NML Capital, Ltd*., 652 F.3d at 194-95; *EM Ltd.*, 473 F.3d at 472. Those factors serve to distinguish this case from *Kensington*, as this Court recently recognized in another case involving a similar alter-ego claim against an Argentine bank. *See Seijas*, 502 F. App'x. at 22-23 ("The facts adduced here fall far short of those alleged in *Kensington*[.]").

### 3. The Express Terms of the FAA Do Not Permit Jurisdiction.

Even assuming the Republic's waiver of immunity in the FAA extends to BCRA (despite what this Court said in *EM Ltd.* and *NML Capital*), that waiver does not cover plaintiffs' current action by its own terms. As the Republic explains in its brief, the waiver of immunity in the FAA applies to actions "brought solely for the purpose of enforcing or executing" a judgment against the Republic with respect to FAA-issued securities. A-329-30. Unlike the attachment proceedings before this Court in *EM Ltd.* and *NML Capital*, the present action is not even arguably "*brought solely*" to "*enforc[e] or execut[e]*" a judgment against the Republic. Plaintiffs are not attempting to attach a specific asset, like the

35

FRBNY funds, in satisfaction of a particular judgment against the Republic. Rather, plaintiffs seek a declaration that, based on conduct unrelated to the FAA (or bonds), BCRA is an alter ego of the Republic for all purposes—and that BCRA is therefore liable for all of the Republic's debts, not merely those related to the bonds. Both plaintiffs' allegations and their requested relief extend far beyond the terms of the FAA's waiver. Accordingly, BCRA joins in the Republic's argument that the present action falls outside the express terms of the FAA's waiver. *See* Republic Br. Part I.

### B. The Republic's Failure to Repay its Debts and BCRA's Use of its FRBNY Account Are Not Commercial Activities that Form the Gravamen of Plaintiffs' Complaint.

The FSIA provides that a foreign instrumentality is not immune from any action "based upon a commercial activity carried on in the United States." 28 U.S.C. § 1605(a)(2). In order for a plaintiff's suit to be "based upon" a commercial activity carried on in the United States, that commercial activity must form the foundation for "those elements of a claim that, if proven, would entitle [the] plaintiff to relief under his theory of the case." *Saudi Arabia* v. *Nelson*, 507 U.S. 349, 357 (1993); *see id.* (noting courts have held that the "focus should be on the gravamen of the complaint") (citation and internal quotation marks omitted). As this Court has therefore recognized, it is not enough for the commercial activity to touch on a single element of a claim. Rather, a "degree of

36

closeness must exist between the commercial activity and the gravamen of the plaintiff's complaint." *Kensington*, 505 F.3d at 156 (internal quotation marks omitted); *see also Reiss* v. *Société Centrale Du Groupe Des Assurances Nationales*, 235 F.3d 738, 747 (2d Cir. 2000) ("To sustain jurisdiction on this basis, there must be a significant nexus . . . between the commercial activity in this country upon which the exception is based and a plaintiff's cause of action.") (citation and internal quotation marks omitted).

In their complaint, plaintiffs vaguely alleged that their suit is based "upon commercial activities . . . that the Central Bank undertakes in the United States as fiscal agent for and as an alter ego of Argentina." A-3030 (TAC ¶ 12). In the 83 paragraphs in which plaintiffs set forth the supposed basis for their alter-ego claim, plaintiffs failed to plead any facts to substantiate that conclusion. A-3034-76 (TAC ¶¶ 31-113). At oral argument, plaintiffs expanded on their vague allegation with two theories: first, plaintiffs argued that their alter-ego claim is "for a breach of a fiscal agency agreement governed by New York law, subject to jurisdiction in New York, . . . [and] payable by a fiscal agent in New York." SPA-29-30 (9/25/13 Tr. 28:22-29:4). Second, plaintiffs argued that BCRA "is acting in New York to gather dollars that are used to repay debt to others and not to [plaintiffs]." SPA-30 (9/25/13 Tr. 29:6-8). The district court accepted those theories without explanation. *See* SPA-32-33 (9/25/13 Tr. 31:25-32:1 (concluding

37

that "there's commercial activity")).  That was error.  Neither of plaintiffs' theories comes remotely close to demonstrating the requisite degree of closeness between commercial activity by BCRA in the United States and the gravamen of plaintiffs' complaint.

### 1.    The Republic's Breach of the FAA Is Not the Gravamen of Plaintiffs' Complaint.

The gravamen of plaintiffs' allegations has nothing to do with the Republic's default on its bonds in 2001.  *See*, *e.g.*, Black's Law Dictionary 770 (9th ed. 2009) (defining "gravamen" as the "substantial point or essence of a claim, grievance, or complaint").  Rather, the essence of plaintiffs' claim is that, based on events that allegedly occurred subsequent to the Republic's 2001 default, BCRA should be deemed the alter ego of the Republic for any and all purposes—and thus should be held responsible for *any and all of the Republic's debts*, not merely its default on plaintiffs' bonds.  Specifically, plaintiffs allege that because, following the default, the Republic amended its laws to increase the amount of money it could borrow from BCRA, increased its coordination with BCRA with respect to monetary policy, and caused increased turnover of BCRA's Governors, BCRA effectively became an alter ego of the Republic for all purposes and remains that way today.  *See* A-3036-56 (TAC ¶¶ 33-75) (lending), 3056-66 (TAC ¶¶ 76-96) (appointment of Governors), 3066-76 (TAC ¶¶ 97-113) (coordination of monetary

policy).  Again, all of that alleged conduct occurred after the default and bears no direct connection to the default itself.

In effect, plaintiffs are attempting to conflate their litigation against the Republic and their litigation against BCRA.  The Republic's breach of the FAA is unquestionably the gravamen of the judgments plaintiffs obtained some years ago against the Republic for the principal and interest owed on the bonds.  *See NML Capital, Ltd.*, 652 F.3d at 176.  The gravamen of the judgment they hope to obtain here, however, is that the Republic and BCRA should be treated as one and the same, which has nothing to do with whether the Republic failed to meet its obligations under the FAA in 2001.  Indeed, plaintiffs did not even mention the Republic's default when setting forth their alter-ego allegations.  To be sure, plaintiffs may hope that success on their alter-ego claim assists in collecting damages on their earlier breach claim, but that would, at most, be the *motive* for plaintiffs' complaint in this action.  The *substance* of this suit is not centered on the Republic's default in 2001.

Moreover, even if somehow the essence of plaintiffs' claim were the Republic's 2001 breach, there still would not be jurisdiction for the two reasons discussed earlier.  Plaintiffs have failed to allege that the Republic exercises domination and control over BCRA, and thus they have failed to overcome the *Bancec* presumption that BCRA is a separate juridical entity.  *See infra* Part II.

39

Accordingly, plaintiffs cannot impute any of the Republic's activity, including its commercial activity in the United States or anywhere else, to BCRA for jurisdictional purposes. And even if some reverse-imputation were permissible under *Bancec*, at a minimum it would have to be conduct in which BCRA was involved. After all, if plaintiffs want to have their cake, they must eat it, too: if the wrongful conduct at issue here is the Republic's breach of the FAA, as plaintiffs maintain, *it is undisputed that BCRA had nothing to do with that breach*. On plaintiffs' own theory, there is no basis for subjecting BCRA to jurisdiction based on conduct by the Republic in which BCRA had no involvement.

### 2. BCRA's Use of its FRBNY Account Is Not the Gravamen of Plaintiffs' Complaint.

In the alternative, plaintiffs contended below that their suit is "based upon a commercial activity carried on in the United States," 28 U.S.C. § 1605(a)(2), because BCRA uses its account at the FRBNY in the process of purchasing dollars in the normal foreign exchange trading in which central banks engage to maintain the value of the national currency. Plaintiffs allege that these purchases are the gravamen of the complaint because BCRA has allegedly provided funds indirectly from its FRBNY account to the Republic, which the Republic has used to repay other creditors but not plaintiffs. *See*, *e.g.*, SPA-30 (9/25/13 Tr. 29:6-8) ("BCRA is acting in New York to gather dollars that are used to repay debt to others and not to [plaintiffs]."), 30-31 (9/25/13 Tr. 29:24-30:2)

("[T]hose activities by BCRA are crucial to the perpetuation of the fraud or injustice that is the alter ego claim.").

This is nonsense. The loans to the Republic that supposedly form a basis of the alter-ego theory occurred in Argentina, not the United States. Indeed, even BCRA's unrelated foreign exchange activity—sales of Argentine currency for dollars—were agreed upon in Argentina with Argentine banks. A-4723-24. The fact that the purchased dollars were delivered to BCRA's account in the United States is entirely incidental to plaintiffs' alter-ego claim. The claim would be no different if BCRA had used an account anywhere else in the world in which to receive the funds.

Indeed, this case is remarkably similar to *Kensington Int'l Ltd* v. *Itoua*, 505 F.3d 147 (2d Cir. 2007), in which this Court held that the defendant's alleged activity in the United States was entirely incidental to the alleged improper conduct. *See id*. at 157-58. In *Kensington*, a judgment creditor of the Congo alleged that a state-owned oil company had entered into pre-payment agreements in exchange for oil rights, which had the effect of diverting Congo's oil revenues and preventing the creditor from collecting on a civil judgment. *See id*. at 152-53. The creditor in *Kensington* argued that its claim was based upon commercial activity in the United States because the oil at issue was shipped to, and the premium payments for that oil were made in, the United States. *See id*. at 156.

41

This Court rejected that argument, reasoning that "[t]he requisite nexus" did not exist between the commercial activity in the United States (*i.e.*, the shipment of oil and the premium payments) and the gravamen of the complaint (*i.e.*, the pre-payment agreements executed outside the United States). *Id*. at 156-57. The Court noted that the scheme would have had "the same alleged effect" if the oil shipments and premium payments had been made somewhere other than the United States. *Id*.

This case is on all fours with *Kensington*. Here, the alleged effect of the parent state's controlling conduct—*i.e.*, the Republic's borrowing from BCRA—and the alleged effect on plaintiffs would be no different if BCRA had used an account outside the United States. *See Nelson*, 507 U.S. at 358 (action not based on activity in the United States because the alleged activity, considered alone, would not entitle plaintiffs to relief). Permitting an alter-ego claim to proceed on the theory adopted below would mean that any claim alleging a sovereign's wrongful use of dollars outside the country could proceed in U.S. courts if the plaintiff could plausibly show that the dollars were acquired in transactions that touched New York. Given New York's role as a financial center, every central bank and every country would be at risk of losing their immunity from suit in the United States from an immense array of claims—indeed, any claim involving dollars in some way—simply because the central bank maintains an

42

account at the FRBNY.  This is not and should not be the law:  it would expand

Section 1605's commercial-activity *exception* to swallow the rule that foreign

central banks are presumptively immune from suit.

### C.     This Action Is Not Justiciable Because It Is Wholly Speculative Whether a Declaratory Judgment Will Redress Plaintiffs' Alleged Injury.

Article III, Section 2 of the United States Constitution restricts

federal courts to deciding justiciable "Cases" and "Controversies" and thus

imposes certain requirements for a plaintiff to show that his dispute is

"appropriately resolved through the judicial process."  *Whitmore* v. *Arkansas*, 495

U.S. 149, 155 (1990); *see also Lujan* v. *Defenders of Wildlife*, 504 U.S. 555,

559-60 (1992).  One of those requirements is redressability:  "it must be likely, as

opposed to merely speculative, that the injury will be redressed by a favorable

decision."  *Bryant* v. *New York State Educ. Dep't*, 692 F.3d 202, 211 (2d Cir.

2012) (quoting *Lujan*, 504 U.S. at 560-61), *cert. denied*, 133 S. Ct. 2022 (2013).

This Court has accordingly made clear that "[w]here the relief sought 'would not

resolve the entire case or controversy as to any [party],' but would merely

determine a collateral legal issue governing certain aspects of . . . pending or future

suits,' a declaratory judgment action falls 'outside the constitutional definition of a

'case' in Article III.'"  *Jenkins* v. *United States*, 386 F.3d 415, 418 (2d Cir. 2004)

(quoting *Calderon* v. *Ashmus*, 523 U.S. 740, 746-47 (1998)) (brackets in original; internal citation omitted).

Here, plaintiffs do not want a declaratory judgment that BCRA is an alter ego of the Republic because they have identified specific attachable assets somewhere in this Circuit. This Court has already said twice that BCRA's property here—the FRBNY account—is immune from attachment. Rather, plaintiffs want an alter-ego declaration in the event that they ever locate non-immune, attachable assets somewhere else. *See* SPA-4 (9/25/13 Tr. 3:21-23) ("We would like to be able to have a judgment that holds BCRA liable for the judgments entered against Argentina that we may enforce as a judgment if we find assets anywhere."), 10-13 (9/25/13 Tr. 9:10-12:15) (explaining that plaintiffs could take the declaratory judgment to places like California, Switzerland, or Germany and use it in an effort to attach BCRA's assets). The district court appeared to adopt that rationale. It seemed to suggest that an alter-ego declaratory judgment would redress plaintiffs' alleged injury because such a judgment could be "used in a proceeding in another state or a foreign country," in the event plaintiffs ever locate attachable assets abroad. SPA-33-34 (9/25/13 Tr. 32:23-33:6).

That reasoning turns redressability on its head. Neither plaintiffs nor the district court could possibly have any idea whether it is "likely, as opposed to merely speculative," that a judgment in plaintiffs' favor would redress their injury.

44

*See Lujan*, 504 U.S. at 561 (internal quotation marks omitted). That is because neither plaintiffs nor the district court has identified (i) the assets elsewhere that plaintiffs want to attach or (ii) the likelihood that courts elsewhere will set aside immunity and give effect to an alter-ego declaratory judgment here. Indeed, the immunity of central bank property is generally *greater* outside the United States, so it is no trifling matter for plaintiffs to identify an attachable asset elsewhere. In fact, BCRA introduced extensive evidence below that foreign courts are highly unlikely to permit plaintiffs to enforce an alter-ego declaration obtained in this action against assets that BCRA may hold in other jurisdictions. *See* A-3088-120 (Switzerland); A-3121-32 (France); A-3221-32 (England); A-3390-99 (Germany).

And although plaintiffs have not done so to date, even if they could identify a specific asset that is attachable in another action, it would not matter for Article III purposes, because a judgment here still would accomplish nothing in and of itself. *See*, *e.g.*, *Chevron Corp.* v. *Naranjo*, 667 F.3d 232, 245 (2d Cir. 2012) (declaratory judgment is justiciable if it "finalize[s] the controversy and offer[s] relief from uncertainty") (internal quotation mark omitted), *cert. denied*, 133 S. Ct. 423 (2012). Rather, the practical effect of that judgment would depend on the outcome of possible future litigation in other fora—and plaintiffs have not shown that there is any bar to litigating the alter-ego question as part of those other proceedings. Simply put, this suit is the very antithesis of redressability: plaintiffs

want a judgment as a prelude to possible and indefinite future litigation in other places over other assets. It would be hard to imagine a more speculative use for a declaratory judgment.

## II. The District Court Erred in Holding that Plaintiffs Have Adequately Pleaded that BCRA Is the Republic's Alter Ego for Any and All Purposes.

The decision below is incorrect for an additional reason that independently requires reversal by this Court: plaintiffs have not alleged sufficient facts to state a claim that BCRA is the Republic's alter ego for any and all purposes. It is undisputed here that, under *Bancec*, BCRA is presumptively a separate juridical entity. *See* 462 U.S. at 626-27. The question is whether plaintiffs have plausibly pleaded either that BCRA "is so extensively controlled by [the Republic] that a relationship of principal and agent is created" or that recognition of BCRA's separate legal status "would work fraud or injustice." *Id*. at 629 (internal quotation mark omitted); *see also De Letelier* v. *Republic of Chile*, 748 F.2d 790, 794-95 (2d Cir. 1984). Plaintiffs have not made a sufficient showing on either score.

### A. Plaintiffs Have Failed to Adequately Plead that the Republic Exercises Complete Control Over BCRA's Day-to-Day Operations.

This Court has held that, in order to satisfy *Bancec*'s first prong, plaintiffs must show that a parent foreign state controls the day-to-day operations

46

of an instrumentality or otherwise completely disregards the corporate form. Otherwise, that instrumentality cannot be treated as an alter ego of the parent foreign state. *See LNC Invs., Inc.* v. *Republic of Nicaragua*, 115 F. Supp. 2d 358, 363 (S.D.N.Y. 2000) (alter-ego test requires a showing that "the government exercises extensive control over the instrumentality's daily operations and abuses the corporate form"), *aff'd sub nom. LNC Invs., Inc.* v. *Banco Central de Nicaragua*, 228 F.3d 423 (2d Cir. 2000) (affirming "for substantially the reasons stated by the district court"); *see, e.g., Seijas*, 502 F. App'x. at 22 ("[E]ven if Argentina took an active role in overseeing the membership of BNA's board[,] . . . this, by itself, does not evidence the extensive control of BNA's day-to-day activities, or abuse of corporate form, necessary to demonstrate a reasonable basis for concluding that BNA was Argentina's alter ego.") (internal quotation marks and citations omitted). Other courts of appeals have likewise consistently looked to whether the parent foreign state controls the day-to-day operations of the instrumentality.[4]

---

[4]     *See*, *e.g.*, *First Inv. Corp.* v. *Fujian Mawei Shipbuilding, Ltd.*, 703 F.3d 742, 753 (5th Cir. 2012) ("[W]e look to the ownership and management structure of the instrumentality, paying particularly close attention to whether the government is involved in day-to-day operations, as well as the extent to which the agent holds itself out to be acting on behalf of the government.") (brackets in original; quoting *Walter Fuller Aircraft Sales, Inc.* v. *Republic of Philippines*, 965 F.2d 1375, 1382 (5th Cir. 1992)); *Doe* v. *Holy See*, 557

*(footnote continued on next page)*

Lesser control is not sufficient because, as set forth in greater detail below, a shareholder commonly exercises some measure of control over the activities of its subsidiary and a government commonly exercises some measure of control over its instrumentalities. Shareholders commonly set strategic direction; make major decisions regarding dispositions of corporate assets; and, in particular, appoint and remove members of the entity's governing board. If such involvement made the entity an alter ego of the parent, the separate status of subsidiaries and instrumentalities would be a nullity.

1. **The District Court Recognized that the Republic Does Not Exercise Complete Control Over BCRA's Day-to-Day Operations.**

What makes this appeal odd is that the district court has consistently found throughout this litigation that the Republic does *not* exercise day-to-day control over BCRA. In the last round of attachment proceedings, the court

---

*(footnote continued from previous page)*

F.3d 1066, 1079-80 (9th Cir. 2009) (*Bancec* requires allegations "of day-to-day control" in order "to overcome the presumption of separate juridical status"); *McKesson Corp.* v. *Islamic Republic of Iran*, 52 F.3d 346, 351-52 (D.C. Cir. 1995) (finding relationship of principal and agent where government controlled routine business decisions, such as declaring and paying dividends and honoring contracts). *Cf. De Letelier*, 748 F.2d at 794-95 (district court's finding of parent government's "direct control" over instrumentality insufficient absent a showing that the parent government "ignored [the instrumentality's] separate status" or created the instrumentality "to shield its owners from liability").

expressly found that "[t]he Republic did not manage the day-to-day operations of BCRA" and "[i]t did not manage the routine transactions regarding Argentine pesos and foreign currency." *EM Ltd.*, 720 F. Supp. 2d at 299. Accordingly, the court declined to hold that the Republic exercised complete control over BCRA or that BCRA was the alter ego of the Republic for all purposes, as plaintiffs had alleged.

At the hearing below, the district court did not question its earlier factual finding or legal ruling. To the contrary, it stated that "BCRA has legitimate functions as far as the money supply of Argentina and so forth. And the assets of BCRA in a general way cannot, in my view, be said to be applicable to the judgment debts of plaintiffs here." SPA-32 (9/25/13 Tr. 31:5-8). Indeed, the court observed, "the idea that BCRA is in a general way liable for the debts of the [R]epublic goes way too far." SPA-31-32 (Tr. 30:25-31:2). The district court thus recognized that BCRA is not the alter ego of the Republic for all purposes.

That should have been the end of the matter: the court should have held that plaintiffs had not rebutted the *Bancec* presumption. It is very difficult to discern why the court nevertheless allowed this suit to move forward. The court stated several times that, in its view (but without foundation), the Republic had used BCRA in an "irregular" way, which the court concluded meant that "*for certain purposes* BCRA is the alter ego of the [R]epublic." SPA-33 (9/25/13 Tr.

49

32:7-18) (emphasis added); *see also* SPA-17-18 (9/25/13 Tr. 16:24-17:5), 32 (9/25/13 Tr. 31:3-14). But plaintiffs do not seek a judgment that BCRA is an alter ego of the Republic for some purposes; they seek a judgment that it is an alter ego for *all* purposes (because they cannot be sure what types of BCRA assets they will want to pursue elsewhere in the world). Whatever the reasoning of the decision below, on its face that decision plainly did not find that plaintiffs have plausibly pleaded that the Republic exercises day-to-day control over BCRA's operations and thus that BCRA is an alter ego for all purposes.

     **2.    In Any Event, There Is No Plausible Basis for Concluding that the Republic Exercises Complete Control Over BCRA's Day-to-Day Operations.**

Nor is there any basis for finding that the Republic exercises day-to-day control over BCRA's operations. Plaintiffs' allegations in their complaint fall into four categories. Each set of allegations indicates nothing more than ordinary interaction between a foreign central bank and its parent government or (by analogy) ordinary shareholder control of a subsidiary.

     a.    Plaintiffs allege that, starting in 1999 but mostly between 2002 and 2012, the Argentine National Congress or Argentina's President amended Argentine laws and issued executive decrees in ways that supposedly made it easier for the Republic to borrow funds from Argentine banks and BCRA. *See* A-3036-39 (TAC ¶¶ 33-35). Such conduct, even if proven, would not demonstrate

control over BCRA's day-to-day operations or abuse of the corporate form. It is not abuse of the corporate form, for example, for a sole shareholder to instruct its board members to vote to increase a dividend, at least as long as the subsidiary remains adequately capitalized (and plaintiffs have never argued that BCRA is undercapitalized). *See Topp* v. *CompAir, Inc.*, 814 F.2d 830, 837 (1st Cir. 1987) ("[A]s long as the corporate formalities were observed . . . the fact that the subsidiary was designed as a 'conduit' for [the parent] is not a reason to ignore the corporate separation."); *Oppenheimer & Co. Inc.* v. *Deutsche Bank AG*, No. 09 Civ. 8154 (LAP), 2010 WL 743915, at *4 (S.D.N.Y. Mar. 2, 2010) (parent's "admitted control over [subsidiary's] financial and operational policies is consistent with an ordinary stockholder-corporation relationship and is not indicative of an alter ego relationship"). It can no more be an abuse of the corporate form for a shareholder, through appropriate procedures, to receive loans from a subsidiary.

b.      Plaintiffs also allege that, between 2005 and 2010, BCRA loaned money to the Republic in Argentina, which the Republic then used to repay creditors other than plaintiffs (including the IMF). *See* A-3039-56 (TAC ¶¶ 36-75). Again, those allegations, even if established, would not demonstrate that the Republic exercises day-to-day control over BCRA. Plaintiffs themselves allege, for instance, that the Republic's proposal to borrow from BCRA in March

51

2010 was reviewed by BCRA's legal advisers and approved by BCRA's Board of Directors. *See* A-3050 (TAC ¶ 61). And plaintiffs also plead that one of BCRA's Governors testified before the Argentine National Congress that it is sensible public policy for the government to borrow funds from BCRA during a period in which BCRA's reserves earn relatively low interest. *See* A-3056 (TAC ¶ 75). Those allegations simply demonstrate that BCRA followed its own procedures in deciding whether to make loans to the Republic and determined that such loans were consistent with its mission. Plaintiffs' real gripe is that, having borrowed money from BCRA under existing procedures, the Republic then elected to pay *other creditors*—but the Republic's decision about which creditors to repay has nothing to do with whether the Republic controls BCRA's daily operations.

        c.     Plaintiffs further allege that, between 2001 and 2012, the Republic exerted control over BCRA by dismissing BCRA Governors who disagreed with governmental policies and replacing them with political allies. *See* A-3056-66 (TAC ¶¶ 76-96). The hiring and firing of board members or officers is an "exercise of power incidental to majority stock ownership" and does not indicate control over the day-to-day operations of the alleged alter ego. *Gen. Star Nat'l Ins. Co.* v. *Administratia Asigurarilor de Stat*, 713 F. Supp. 2d 267, 279-84 (S.D.N.Y. 2010) (plaintiff failed to demonstrate Romanian government's exercise of sufficient day-to-day control). Courts have therefore consistently rejected the

notion that appointment of an instrumentality's officers or directors overcomes the *Bancec* presumption. *See Transamerica Leasing, Inc.* v. *La Republica de Venezuela*, 200 F.3d 843, 849 (D.C. Cir. 2000) ("If majority stock ownership and appointment of the directors were sufficient, then the presumption of separateness announced in *Bancec* would be an illusion."); *Foremost-McKesson, Inc.* v. *Islamic Republic of Iran*, 905 F.2d 438, 446-47 (D.C. Cir. 1990) (collecting cases).[5] The motive for appointing or dismissing an officer or director—whether political or otherwise—is irrelevant. "[T]he only relevant question here is whether the government continued to exert control over the appointee in his daily operations of the bank." *Gen. Star*, 713 F. Supp. 2d at 277 (finding that plaintiffs failed to show how the government exerted control over political appointee's daily operation of bank).

---

[5] *See, e.g.*, *Hester Int'l Corp.* v. *Fed. Republic of Nigeria*, 879 F.2d 170, 181 (5th Cir. 1989) ("The two factors of 100% ownership and appointment of the Board of Directors cannot by themselves force a court to disregard the separateness of the juridical entities."); *NML Capital, Ltd.* v. *Republic of Argentina*, No. 09 Civ. 7013 (TPG), 2011 WL 524433, at *6 (S.D.N.Y. Feb. 15, 2011) ("[T]he Republic in effect owns ENARSA and appoints the controlling majority of its board. The law is clear that, in and of itself, this situation does not create an alter ego relationship."); *Minpeco, S.A.* v. *Hunt*, 686 F. Supp. 427, 435 (S.D.N.Y. 1988) (sole shareholder has legitimate interest in major decisions of wholly-owned subsidiary; daily control is the relevant inquiry for alter-ego purposes).

d.      Finally, plaintiffs allege that, between 2004 and 2010, BCRA and the Republic coordinated monetary policy.  *See* A-3066-76 (TAC ¶¶ 97-113). Such conduct would not remotely support an inference that the Republic controls BCRA's daily operations.  Governments and central banks typically consult and coordinate with respect to monetary policy.  *See*, *e.g.*, A-3593 (U.S. Treasury Department's Annual Report to Congress, covering Nov. 1, 1996 to Oct. 31, 1998) (describing U.S. monetary authorities' coordinated June 1998 intervention in foreign exchange markets); A-3610 (handbook published by the Centre for Central Banking Studies) ("[H]owever independent a central bank is, the ultimate decisions on a country's currency . . . are usually taken by the government.").  Even if a resulting policy is politically or ideologically unpopular, or draws criticism as being too "inflationary" or too "deflationary"—which is the substance of many of plaintiffs' allegations, *see* A-3066-67 (TAC ¶¶ 97-98), 3072-76 (TAC ¶¶ 107-13)—it is not an indication of the government's interference in BCRA's daily operations.[6]

---

[6]     *See Foremost-McKesson*, 905 F.2d at 440 ("[M]ere involvement by the state in the affairs of an agency or instrumentality does not answer the question whether the agency or instrumentality is controlled by the state for purposes of FSIA."); *LNC Invs.*, 115 F. Supp. 2d at 364-65 (government's "general supervisory role over the Central Bank's operations" does not support an alter-ego finding); *see also United States* v. *Bestfoods*, 524 U.S. 51, 72

*(footnote continued on next page)*

Taking plaintiffs' allegations together, they are strikingly similar conduct to what the Court found insufficient to overcome the *Bancec* presumption in *Seijas* v. *Republic of Argentina*, 502 F. App'x. 19 (2d Cir. 2012). In *Seijas*, the plaintiffs alleged that Banco de la Nación Argentina ("BNA"), a commercial bank wholly owned by the Republic, was the alter ego of the Republic and thus liable for the plaintiffs' judgments against the Republic. Specifically, plaintiffs alleged that "(1) Argentina appointed and removed BNA's directors, (2) BNA made favorable loans to individuals and corporations that were in Argentina's political interests, (3) BNA made loans to Argentina in violation of its governing charter, and (4) BNA's financial records were not transparent." *Id.* at 21. This Court held that, "[e]ven accepted as true, however, these allegations are insufficient to establish the extensive control necessary to sustain an alter-ego claim or even to establish a reasonable basis for assuming jurisdiction." *Id.* The decision below does not address *Seijas* or make any attempt to distinguish the present case.

---

*(footnote continued from previous page)*

(1998) (a parent can supervise decisions and set policies of subsidiary without forfeiting limited liability).

### 3. Finding that BCRA Is an Alter Ego Based on Conduct Typical of Foreign Central Banks Would Do Serious Harm to This Nation's Interests.

The last time that this case was here in *NML Capital*, the United States persuasively argued that "BCRA's alleged involvement in repaying the Republic's debts to the IMF" was not evidence of an alter ego because, among other reasons, "central banks commonly perform payment functions for their governments, including central banks that are relatively independent." A-3552, 3569. Moreover, the United States questioned whether other types of conduct— like "a foreign state's involvement in the decision of its central bank to increase its U.S. dollar reserves" or "a central bank's payment of debt to creditors other than the IMF"—could show "a foreign state's day-to-day control over central bank operations." A-3570-71 n.*. "[C]entral banks ordinarily have a high degree of interaction with their parent foreign governments," the United States observed, and "courts should give significant deference to a foreign government's conduct vis-à-vis its central bank." A-3571 n.*.

The United States' point is a crucial one. Many foreign central banks hold their reserves in dollar-denominated assets in the United States, and many of them have a high level of interaction or coordination with their parent foreign governments in performing their respective functions (like setting monetary policy, for instance). If those facts are sufficient not only to permit jurisdiction over a

foreign central bank, but to plead that the bank is generally liable for its parent foreign state's debts as an alter ego, that will threaten serious harm to this Nation's interests. Foreign central banks may be led to withdraw their reserves from the United States and place them in other countries. *See EM Ltd.*, 473 F.3d at 473 (FSIA was intended to protect the assets of foreign central banks and thus encourage the deposit of foreign funds in the U.S.). And beyond endangering the ability of this country to attract and keep dollar reserves, subjecting foreign central banks to jurisdiction and liability would weaken reciprocal principles of immunity that are critical to ensuring U.S. reserves abroad receive adequate protection. It is therefore important for this Court to reiterate in this case that "significant deference" is warranted "to a foreign government's conduct vis-à-vis its central bank." A-3571 n.*.

### B. Plaintiffs Have Failed to Adequately Plead That Recognizing BCRA's Separate Legal Status Would Work Fraud or Injustice.

The decision below did not hold that BCRA may be held generally liable for the Republic's debts under *Bancec*'s second prong. Plaintiffs' arguments on that score, however, are meritless and do not provide an alternative basis for affirmance. Plaintiffs have alleged that, because the Republic has paid other creditors but not them, it would be a fraud or injustice to permit BCRA to invoke its separate legal status. *See* A-3076-77, 3078 (TAC ¶¶ 114, 118). But courts have repeatedly held that it is not a fraud or injustice for *Bancec* purposes for a foreign

57

instrumentality to invoke the protections and immunities expressly granted to it by Congress. *See*, *e.g.*, *Alejandre* v. *Telefonica Larga Distancia De Puerto Rico, Inc.*, 183 F.3d 1277, 1286-87 & 1286 n.22 (11th Cir. 1999) (noting that although the "concern about the injustice of preventing plaintiffs from collecting their judgment is understandable," it is "not the type of injustice that concerned the *Bancec* Court"); *Gabay*, 151 F.R.D. at 254 n.5 (it is not fraud or injustice to invoke separate status where control not proven); *Minpeco*, 686 F. Supp. at 432 (same). Moreover, if a parent state's nonpayment of creditors, repayment of only some creditors, or breach of contractual provisions were "fraud or injustice" under *Bancec*, the presumption that *Bancec* established would be effectively meaningless. That presumption is meaningful precisely because it shields a foreign agency or instrumentality from liability in cases where a parent state has allegedly failed to comply with its obligations.

58

## CONCLUSION

For the foregoing reasons, this Court should reverse and vacate the

district court's order and dismiss the Third Amended Complaint with prejudice.

Dated:    New York, New York
          January 15, 2014

SULLIVAN & CROMWELL LLP

By:   /s/  Joseph E. Neuhaus
      Joseph E. Neuhaus
      Michael J. Ushkow
      Zeh S. Ekono
      125 Broad Street
      New York, New York  10004-2498
      (212) 558-4000

      Jeffrey B. Wall
      1701 Pennsylvania Avenue, N.W.
      Washington, D.C.  20006
      (202) 956-7500

      *Counsel for Banco Central de la*
      *República Argentina*

59

## CERTIFICATE OF COMPLIANCE

I hereby certify that:

1.     This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 13,913 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word 2010 in 14-point Times New Roman font.

Dated:   New York, New York
         January 15, 2014

SULLIVAN & CROMWELL LLP

By:   /s/  Joseph E. Neuhaus
      Joseph E. Neuhaus
      125 Broad Street
      New York, New York  10004-2498
      (212) 558-4000

      *Counsel for Banco Central de la*
      *República Argentina*

# SPECIAL APPENDIX

# TABLE OF CONTENTS

PAGE

Order of the Honorable Thomas P. Griesa, U.S.D.J., entered on
September 26, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SPA-1

Transcript of Oral Argument before the Honorable Thomas P. Griesa,
U.S.D.J., on September 25, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SPA-2

28 U.S.C. § 1330. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SPA-35

28 U.S.C. § 1602. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SPA-36

28 U.S.C. § 1603. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SPA-37

28 U.S.C. § 1604. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SPA-39

28 U.S.C. § 1605. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SPA-40

28 U.S.C. § 1610. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SPA-44

28 U.S.C. § 1611. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SPA-48

28 U.S.C. § 2201. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SPA-50

28 U.S.C. § 2202. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SPA-52

U.S. Const. art. III, § 2, cl. 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SPA-53

# SPA-1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/26/2013
```

-------------------------------------------x
                                 :

EM LTD. and NML CAPITAL, LTD.,       :

                                 :

             Plaintiffs,    :    06 Civ. 7792 (TPG)

                                 :

      – against –         :    **ORDER**

                                 :

BANCO CENTRAL DE LA REPÚBLICA    :
ARGENTINA and THE REPUBLIC OF    :
ARGENTINA.                      :

                                 :

             Defendants.   :
-------------------------------------------x

      Plaintiffs EM Ltd. and NML Capital, Ltd. bring this action for a

declaratory judgment against defendants Banco Central de la República

Argentina ("BCRA") and the Republic of Argentina (the "Republic") and for

money damages against BCRA, as an alter ego of the Republic. The

Republic and BCRA filed separate motions to dismiss the plaintiffs' third

amended complaint.

      For the reasons stated by the court at oral argument on September

25, 2013, defendants' motions to dismiss are denied.

      This order resolves the motions located at Doc. Nos. 168 and 174.

      SO ORDERED.

Dated:  New York, New York
        September  26, 2013

                                   Thomas P. Griesa
                                   U.S. District Judge

# SPA-2

1

```
      D9pgnmlc
 1  UNITED STATES DISTRICT COURT
 1  SOUTHERN DISTRICT OF NEW YORK
 2  ------------------------------x
 3  NML CAPITAL, LTD., et al.,
 4                Plaintiffs,
 5        v.                          06 CV 7792 (TPG)
 6  THE REPUBLIC OF ARGENTINA,
 7                Defendants.
 8  ------------------------------x
 9                                    New York, N.Y.
 9                                    September 25, 2013
10                                    3:10 p.m.
11
12  BEFORE:
13                   HON. THOMAS P. GRIESA,
14                                         District Judge
15                   APPEARANCES
16  DECHERT
16        Attorneys for NML
17  BY:  ROBERT A. COHEN
17        ERIC KIRSCH
18        DENNIS HRANITZKY
18
19  DEBEVOISE & PLIMPTON
19        Attorneys for EM, LTD.
20  BY:  DAVID RIVKIN
20        SUZANNE GROSSO
21
21  SULLIVAN & CROMWELL
22        Attorneys for BCRA
22  BY:  JOSEPH NEUHAUS
23        ZEH S. EKONO
23        TALY DVORKIS
24        MICHAEL USHKOW
25
              SOUTHERN DISTRICT REPORTERS, P.C.
                   (212)805-0300
```

# SPA-3

D9pgnmlc

```
 1              (Case called)
 2              THE COURT:  This revisits some issues we've had, so
 3  I'm not going to handle the argument in the usual way.  The
 4  presentation by the plaintiffs is very powerful, to say the
 5  least.
 6              It builds on an earlier decision which I rendered when
 7  we were dealing with possible attachment or execution of money
 8  at the federal reserve.  And I held at that time that BCRA was
 9  the alter ego for the purpose of dealing with that fund.  The
10  Court of Appeals reversed, but did not really reverse in any
11  sense to any degree what I had said about the alter ego issue.
12  Now there is more information relevant to the alter ego issue
13  which the plaintiffs have brought up.
14              The problem is whether it is appropriate to enter a
15  declaratory judgment.  I'm looking now at the plaintiff's
16  brief, page 33:  Declaratory relief will resolve the ongoing
17  dispute between plaintiffs and defendants regarding whether
18  BCRA can be held liable for the republic's debts to plaintiffs.
19              At page 34:  There is no doubt that declaratory relief
20  would serve a useful purpose in settling the legal relations at
21  issue and in affording relief from the controversy giving rise
22  to this proceeding.  It would confirm and reduce to a final
23  judgment this Court's prior ruling on the issue of whether BCRA
24  can be held liable for the republic's debts to plaintiffs.
25              Now, I don't recall that we have had some ongoing
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212)805-0300

**SPA-4**

3

D9pgnmlc

1    controversy about whether BCRA would be liable for the debts of
2    the republic.  We had the one issue about the fund at the
3    Federal Reserve Bank, but we haven't been having an ongoing
4    issue about whether BCRA would be liable for the republic's
5    debts to the plaintiffs.  Have we?  I don't know of such
6    ongoing controversy.
7              MR. COHEN:  You're absolutely correct that in the
8    context of an attachment, your Honor found that BCRA is the
9    alter ego of Argentina.
10             THE COURT:  Either go to the lecturn or keep seated
11   because the microphones don't reach too well.
12             MR. COHEN:  It's Robert Cohen from Dechert for NML
13   Capital.
14             In the context of the attachment, you found that BCRA
15   was the alter ego of Argentina.  The benefit of a declaratory
16   judgment will be that that issue will be resolved for once and
17   for all; that is, the assets.
18             THE COURT:  For once and for all to take care of what
19   issues?
20             MR. COHEN:  Finding assets that we can enforce
21   against.  We would like to be able to have a judgment that
22   holds BCRA liable for the judgments entered against Argentina
23   that we may enforce as a judgment if we find assets anywhere.
24             THE COURT:  Before this third-amended complaint, I've
25   never been asked to hold that BCRA is liable in a general way

# SPA-5

D9pgnmlc

4

1  for the debts of the republic to these plaintiffs.
2          I don't think I've even ever been asked to do that
3  before.
4          MR. COHEN:  That would be the consequence of an alter
5  ego finding; that is, the alter ego will be the same as
6  Argentina and its assets will be available as a general
7  proposition for the debts of Argentina.
8          THE COURT:  This just jumps way too fast too far.
9          MR. COHEN:  Actually, this was in our first complaint
10  as an allegation.  A request for relief in our very first
11  complaint was that you enter a money judgment.  It was, in
12  fact, your Honor's suggestion that we break that out as a
13  separate cause of action, that we ask for a money judgment
14  against BCRA as a consequence of the declaration that they are
15  one.
16          This goes back to 2005/2006, your Honor.  And the
17  first time we sought to attach assets at BCRA was on the basis
18  that there had been an announcement that Argentina was going to
19  use funds at BCRA to repay the IMF loan.  And we brought an ex
20  parte attachment proceeding.
21          THE COURT:  But that was about the fund at the federal
22  reserve, right?
23          MR. COHEN:  Yes.  And we said the evidence that we'll
24  be able to present to you will show such complete domination
25  and control.

SOUTHERN DISTRICT REPORTERS, P.C.
(212)805-0300

# SPA-6

D9pgnmlc

1      THE COURT:  I know that, but the thing is, that
2 related to an attempt to attach or execute upon a very specific
3 fund and that was the money, a hundred million dollars or so,
4 at the Federal Reserve Bank.
5      MR. COHEN:  Yes.
6      THE COURT:  Maybe it was pleaded, and it doesn't make
7 a lot of difference, but I have never really had any litigation
8 about the broader issue of whether BCRA would be liable in a
9 general way for the debts of the republic to the plaintiffs.
10      In my view and, obviously, it's true as a matter of
11 fact, it's a very different matter to deal with a specific
12 fund, and we had a lot of evidence about that fund, what it was
13 and so forth.  It was evidence about that fund.
14      The question of whether the BCRA in a general way is
15 liable for the debts of the republic, I've never made any
16 holding about that, and I really have never even had a
17 litigation, I don't think, and I could be forgetting something,
18 but I don't think I really had the issue come up and really be
19 discussed among us about a general liability.
20      MR. COHEN:  I'll put it in context, your Honor.
21      When we did that attachment action and filed our
22 complaint, one of the first amended complaints had a cause of
23 action, a separate cause of action, asking for a money
24 judgment.  That response to that motion, that complaint, was
25 deferred.  We kept extending the time to deal with the issue of
          SOUTHERN DISTRICT REPORTERS, P.C.
                 (212)805-0300

**SPA-7**

D9pgnmlc
1  that complaint until after the Second Circuit resolved the
2  attachment of the assets that your Honor was focusing on.
3          Always in the background was the ultimate issue of
4  alter ego.  And, your Honor, when you focused on the assets
5  that we were seeking to attach, one of the things that you
6  needed to address was, is BCRA the alter ego of Argentina.
7  Because if it's not, I don't even have to worry about whether
8  that asset is being used for commercial activity and all the
9  other issues.
10         So, the finding that BCRA was, in fact, the alter ego
11  was a predicate to get to the analysis of the assets at
12  question.  And it was what the Second Circuit focused on, these
13  assets.
14         THE COURT:  You're not really getting my question.  I
15  held, and still believe it is correct, although the Court of
16  Appeals reversed me on another point, but I believe it is
17  correct to say and I think it was correct to say that BCRA was
18  the alter ego of the republic for the purpose of dealing with
19  that particular fund.
20         I want you to focus on this:  In my view, and I think
21  it's transparent, that is to say, BCRA was the alter ego of the
22  republic in order to deal with that particular fund; it goes
23  way beyond that to say that BCRA is liable in a general way for
24  the debts of the republic.
25         MR. COHEN:  All we are asking for, your Honor, is for
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212)805-0300

**SPA-8**

```
D9pgnmlc
```

1    you not to dismiss the complaint but to allow us to persuade
2    you that BCRA is, in fact, for all purposes the alter ego.
3    That's not a ruling you need to make today.
4         All you need to do today is say we pled enough to
5    survive any motion to dismiss and we have jurisdiction.  And
6    then we'll get on with proving the merits of the case.  We're
7    not moving for summary judgment today; we're not asking you to
8    find that ultimate conclusion today.
9         THE COURT:  I really have a question of whether there
10   is a cause of action here for declaratory relief.  Maybe you
11   just don't want to address it.  I don't know.
12        But the thing is, it seems to me on this motion to
13   dismiss, I'm looking at page 33 of your brief, "Declaratory
14   relief will resolve the ongoing dispute between plaintiffs and
15   defendants regarding whether BCRA can be held liable for the
16   republic's debts to plaintiffs."
17        That's in your own brief.
18        MR. COHEN:  And that means liable in a general sense
19   as the alter ego for the debts that are owed to us by the
20   republic.  That's the question.
21        MR. RIVKIN:  David Rivkin representing EM Limited, the
22   other plaintiff.  Let me put those statements in context.
23        THE COURT:  Please.  That's fine.
24        MR. RIVKIN:  As Mr. Cohen said, we're not asking you
25   today to issue a declaratory judgment that they are liable for

                    SOUTHERN DISTRICT REPORTERS, P.C.
                             (212)805-0300

# SPA-9

D9pgnmlc

1  all the debts going forward.

2          We have properly pled an alter ego complaint.  We have
3  pled a complaint that has jurisdiction.  We have pled the facts
4  that show that.  The language on which you have focused was in
5  response to an argument that BCRA made in their motion to
6  dismiss.

7          That motion said the Court should exercise its
8  discretion under the declaratory judgment act to decline
9  jurisdiction and dismiss the complaint, and then it went on to
10  say an alter ego declaration would neither serve a useful
11  purpose nor finalize the controversy or offer relief from
12  uncertainty.

13          First of all, BCRA recognizes that this is a
14  discretionary act on your part.

15          THE COURT:  You're not getting my question at all.

16          MR. RIVKIN:  I think I am.  We have pled a declaratory
17  judgment act.  They are asking you to decline jurisdiction on a
18  discretionary basis because they think ultimately, it might not
19  serve any purpose.

20          THE COURT:  You're not really addressing my question
21  at all.  Now, I have a question, and that is, whether there is
22  a purpose to be served, within the meaning of the declaratory
23  judgment statute, a purpose to be served to have declaratory
24  relief.  And to say that all that's going on is a motion to
25  dismiss and so forth, of course.

                   SOUTHERN DISTRICT REPORTERS, P.C.
                           (212)805-0300

**SPA-10**

D9pgnmlc

1        But the question before me is, is this a meritorious
2  claim, and I don't think either of you want to really address
3  that.
4        MR. COHEN:  I can tell you what we would do if we get
5  to declaratory judgment and how would it help us.
6        THE COURT:  Yes.
7        MR. COHEN:  What are we going to do practically with
8  the declaratory judgment or the money judgment that we have
9  asked for?
10       Your Honor has allowed us to have discovery into the
11  assets of BCRA.  Let's assume that we can find that BCRA has
12  deposits at the Federal Reserve Bank in California.  I want to
13  take my judgment that they are liable to me for the amounts
14  that are owed under the bonds, go to California and attach that
15  account without having to go through an alter ego proceeding in
16  California.
17       Another example, your Honor, you may remember BIS, the
18  Bank for International Settlements in Geneva where Argentina
19  moved its money to BCRA's account there.  We tried to take
20  discovery and your Honor declined to give it to us because you
21  didn't think you have jurisdiction over BCIS, but you said you
22  would be willing to help us if that came up again.
23       BIS has immunity from attachment, its own immunity.
24  It has told our counsel in Switzerland and it's in the record
25  that if --

# SPA-11

D9pgnmlc

```
 1              THE COURT:  What is BIS?
 2              MR. COHEN:  It's the Bank for International
 3    Settlement.  It's sort of the central bank for central banks.
 4    It's where central banks deposit money.
 5              THE COURT:  It's not Argentine.
 6              MR. COHEN:  No.  It's in Switzerland.  It's an
 7    international organization.  And Argentina has deposited
 8    essentially all of its reserves at the BIS disproportionate to
 9    any other central bank.  It has moved its money there because
10    it enjoys it thinks immunity from attachment.  The immunity
11    belongs to BIS itself under Swiss law.  BIS can't be sued
12    unless it allows itself to be sued.
13              It has said the reason it's not willing to allow us to
14    reach those funds is because BCRA is separate from Argentina
15    and Argentina is our debtor.
16              THE COURT:  Say that again.
17              MR. COHEN:  It has said it will not --
18              THE COURT:  Who has said?
19              MR. COHEN:  The Bank for International Settlements,
20    BIS, when we tried to attach funds there, it asserted its
21    immunity.
22              THE COURT:  Did you bring a proceeding in Switzerland?
23              MR. COHEN:  We did, your Honor.  It asserted its
24    immunity, and that immunity was upheld.  But it said the reason
25    that it asserted that immunity was because BCRA, in its view,
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212)805-0300

# SPA-12

```
D9pgnmlc
```

1  was separate from Argentina; and BCRA, the Central Bank of
2  Argentina, had the account at BIS.  So, BIS was not going to
3  let anyone attach it.  It wasn't the same entity.
4          THE COURT:  But the proceeding you brought in
5  Switzerland was against whom?
6          MR. COHEN:  Argentina on the basis that the money in
7  the account at BIS belonged to Argentina; on the basis that
8  both it was its money and it was the alter ego of BCRA.
9          THE COURT:  I take it that the actual deposit was in
10 the name of BCRA.
11         MR. COHEN:  That's correct.  It was on that basis that
12 BIS declined to waive its own immunity and allow the proceeding
13 to go ahead but indicated that if there was reason to believe
14 that if BCRA was in fact one and the same with Argentina, it
15 might look at it differently.  I'm not representing to the
16 Court that it will, but we have reason to believe it might.
17 And that suggests that we may be able to have access to
18 $40 billion that's on deposit at the BIS.  If we can take to
19 BIS a declaration from this Court that, in this Court's view,
20 BCRA is in fact the alter ego of Argentina, that's one very
21 practical example.
22         That example gets repeated when I suggest that BCRA
23 has money on deposit at other places around the world.  We know
24 at one time they had funds on deposit in Germany, Euro dollar
25 deposits, Euro deposits.  If we could go to Germany and argue

# SPA-13

D9pgnmlc

1 that they're the alter ego, we might be able to attach those
2 assets.
3           Now, declarations from lawyers in England and France
4 and Germany have been submitted in support of the motion to
5 dismiss to suggest that it's a waste of time; we can't do that.
6 My representation to the Court is each one of those
7 declarations is equivocal in some important respect.
8           It's the lawyers' view that a court would probably do
9 something or it was unlikely it would do something.  We would
10 like to take the declaratory judgment and a money judgment to
11 Frankfurt and argue that the alter ego ruling should be
12 recognized there and that we should have access to those funds.
13 Those are the practical ways in which we would be able to take
14 advantage of a judgment against BCRA.  It's not purely
15 hypothetical.
16           MR. RIVKIN:  If I may just add one other thing.  The
17 purpose of the declaratory judgment act, of course, since
18 you're asking why a declaratory judgment, is so that we don't
19 need to relitigate the issue.  That's why you ask for a
20 declaratory judgment when there's an ongoing controversy so the
21 same issue doesn't need to be relitigated every place whether
22 we find assets in California or Switzerland or otherwise.
23           As Robert said, having this declaratory judgment
24 settles that ongoing dispute between us and BCRA about whether
25 they are the alter ego.  Otherwise, we have to litigate it in

SOUTHERN DISTRICT REPORTERS, P.C.
(212)805-0300

# SPA-14

D9pgnmlc

1    the context of particular assets over and over again, and we've
2    seen how long it can take to litigate that.
3              What we're asking you to do and the reason why parties
4    ask for declaratory judgments is to have a ruling on the issue
5    that can then be used to resolve future issues.
6              MR. NEUHAUS:  May I be heard.
7              THE COURT:  Can I question the lawyer for BCRA?
8              MR. NEUHAUS:  That's me.  Joseph Neuhaus from Sullivan
9    & Cromwell.
10             THE COURT:  I know this is in the record, but just
11   refresh my memory.  What does BCRA do?
12             MR. NEUHAUS:  It's the Central Bank of Argentina.
13             THE COURT:  As the central bank, again, what does it
14   do?
15             MR. NEUHAUS:  It's a separate instrumentality that
16   engages in all kinds of activities, supervising the stock
17   market, it engages in foreign exchange trading to maintain the
18   value of the currency and a whole lot of other activities that
19   central banks traditionally do.
20             If I may respond to what was just said.
21             THE COURT:  Can you just continue with my question for
22   a moment.
23             MR. NEUHAUS:  Sure.
24             THE COURT:  You see, what has happened in this
25   litigation, there's been a lot of evidence of certain things
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212)805-0300

# SPA-15

D9pgnmlc

1  that BCRA does, but what I'm really trying to get beyond that
2  and you're responding, but can you just elaborate on what
3  you've just said a little bit.
4          MR. NEUHAUS:  There is in the record this statute of
5  the charter of the central bank which lists all of its duties
6  and they include all kinds of duties.  It's very much like what
7  the fed does here.  It's a little bit broader because they have
8  a jurisdiction over the banking system generally.
9          THE COURT:  You mean in Argentina.
10         MR. NEUHAUS:  In Argentina.
11         For example, banks have to post reserves to secure
12 their foreign exchange and that's posted with the central bank.
13 They do supervise, as I said, the stock exchange.  They do
14 engage in trading to maintain the currency.  There's a whole
15 host of activities.
16         THE COURT:  Are you indicating that local banks have
17 deposits at the central bank?
18         MR. NEUHAUS:  Yes, local banks do have deposits.  They
19 have a requirement that they post certain reserves to secure
20 their own holdings of foreign exchange.  That's just one of
21 many functions.
22         THE COURT:  Please don't read the statute.
23         MR. NEUHAUS:  I won't.  I'm just trying to remind
24 myself of some of the functions.
25         THE COURT:  What does the central bank disburse money
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212)805-0300

**SPA-16**

15

D9pgnmlc
1 for?  In other words, they take in certain entities' deposit
2 money with them.  What do they disburse money for?
3          MR. NEUHAUS:  For example, those entities may reduce
4 their reserves, the banks may reduce their reserves and a
5 central bank would, of course, disburse that money.  The bank
6 would also use foreign exchange, let's say they have dollar
7 reserves, they would use those funds to buy pesos.  If it was
8 in the bank's view necessary to maintain the value of the
9 currency, they would pull pesos out of the market and they
10 would use dollars, for example, to buy the pesos in the
11 Argentine market.
12          It's one of the things central banks do to maintain
13 the value of the currency every day.
14          THE COURT:  I think that's one of the kinds of things
15 the Court of Appeals referred to.
16          MR. NEUHAUS:  Yes.  They do print money.  They also
17 issue debt, domestic debt.
18          THE COURT:  In what way do they print money?  Do they
19 buy?
20          MR. NEUHAUS:  They're responsible for the supply of
21 pesos in the Argentine economy.  It's a whole host of central
22 banking functions that are engaged in by all central banks
23 around the world.
24          I'm not sure whether that's responsive to your
25 questions.
                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212)805-0300

# SPA-17

D9pgnmlc

```
 1              THE COURT:  It is.
 2              MR. NEUHAUS:  A declaratory judgment, if I might just
 3    address a little bit of what was said, it's not intended to be
 4    a stepping stone to other litigation.  A declaratory judgment
 5    is supposed to end litigation.  So, the concept that you go and
 6    get a declaratory judgment in order then to take it somewhere
 7    else is not how declaratory judgments are supposed to work.  If
 8    they were to work that way, it wouldn't make any sense.
 9              In this case, for example, they haven't found any
10    assets in the United States that are attachable.  They're not
11    likely to find any assets anywhere in the world that are
12    attachable because central bank immunity around the world in
13    most countries, and certainly in all the countries they
14    mentioned, is much stronger than in the United States, and
15    that's what the evidence here says.  And they haven't offered
16    any evidence, any declarations, anything that suggests
17    otherwise in this record.  So, the BIS's immunity is absolute;
18    it is not subject to attachment except under a treaty that
19    creates the BIS.
20              So, the concept that you could ever take a declaratory
21    judgment from the United States and go elsewhere and get
22    somebody to recognize it in order to allow attachment of funds
23    is completely fanciful and speculative.
24              THE COURT:  The problem that exists in this case is
25    what I'll call irregularities.  What you have is something that
```

# SPA-18

D9pgnmlc

1 I hope would not exist with England or Germany, and that is a
2 republic which will not pay its just debts.  And what you
3 further have is what I would call irregular usage of the
4 central bank, whether irregular is the best word, but I think
5 everybody knows what I'm talking about.
6          This is what I talked about in my original decision.
7 It's what is talked about in the complaint here, and that is,
8 this is not the bank of England; it's not the Federal Reserve
9 Bank of the United States.  It is a bank which is the central
10 bank of a country that will not pay its contractual just debts
11 as reflected in a very recent Court of Appeals decision, which
12 I'm sure you have read.
13          Then what you have, in addition to what I'm sure is
14 very regular, very legitimate central bank functions which
15 you've described very well, what you have is the use of the
16 central bank in ways that I have described in an earlier
17 decision and I describe here.
18          What you have is a problem that would not exist if all
19 were regular and all were honest which is what you would like
20 to be talking about, but it doesn't exist here.  And that's the
21 problem of the Court.  It doesn't exist.
22          You've got a dishonest situation in the republic, and
23 dishonesty basically is what has been found by our Court of
24 Appeals.  To say that it should be treated in the regular way,
25 of course, you'd argue that, but we don't have a regular

**SPA-19**

D9pgnmlc

1  situation, and that's my problem.
2         MR. NEUHAUS:  May I.  When I mentioned Germany and
3  England and so forth, I wasn't trying to compare the activities
4  of the Central Bank of Argentina.
5         THE COURT:  When it happens in Germany and England,
6  probably things are pretty regular, but they are not regular in
7  Argentina.  They are not regular.
8         MR. NEUHAUS:  I was trying to make a different point.
9  I'm sorry if I was unclear.
10        I was just responding to the point that they could
11 take a declaratory judgment from this Court and go to England
12 and attach assets.
13        THE COURT:  I know.
14        MR. NEUHAUS:  Okay.
15        THE COURT:  Maybe that's the point you were making,
16 but I'm talking about a different point.
17        MR. NEUHAUS:  At this stage on a motion to dismiss,
18 your Honor, the question I think is the one that you posed,
19 which is, is this an appropriate case for a declaratory
20 judgment.
21        We submit, and we think that the record indicates,
22 that there is no way that a declaratory judgment would in fact
23 resolve anything.
24        If a declaratory judgment is needed to obtain an
25 attachment in England or in Switzerland, bring the attachment,

                     SOUTHERN DISTRICT REPORTERS, P.C.
                            (212)805-0300

**SPA-20**

19

D9pgnmlc
```
 1  you bring the action where the assets are.
 2          And one reason for that, your Honor, is that a
 3  declaratory judgment here --
 4          THE COURT:  You see, what you're talking about, of
 5  course, it's correct, but what the Court is faced with is that
 6  for 11 years or so because of the refusal of the republic to
 7  pay its contractual just debts, the plaintiffs have been
 8  seeking ways to recover.  They're seeking ways to recover
 9  against somebody who owes them a lot of money and won't pay.
10  And it's been going on since 11 or 12 years.
11          The thing is that there is some merit to the idea that
12  a finding by this Court confirming what I have already found
13  would be of legitimate use to the plaintiffs here in their
14  ongoing effort to recover on their very large judgments.
15          MR. NEUHAUS:  May I respond on that.
16          THE COURT:  Yes.
17          MR. NEUHAUS:  As your Honor said a few minutes ago,
18  your Honor addressed alter ego in the context of a particular
19  fund.
20          Your Honor has not, as far as I know, ever held that
21  BCRA is liable for all the debts of the republic which is the
22  declaration that they're seeking, in a general way, which would
23  require a very expensive inquiry into the republic's control
24  over the day-to-day activities across the waterfront.
25          THE COURT:  Let me just say very quickly, I don't buy
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212)805-0300

# SPA-21

D9pgnmlc

1   the idea that BCRA is liable for all the debts of the republic.

2        MR. NEUHAUS:  That is the declaration they're seeking;

3   that is the cause of action they're seeking.

4        THE COURT:  What Mr. Cohen spoke of is something that

5   would be more specific.  And it is certainly conceivable that

6   the plaintiffs could find some deposit or some asset of BCRA

7   which would legitimately be available to help satisfy the

8   unpaid judgment debt.

9        MR. NEUHAUS:  And if they do, your Honor, then they

10   bring an alter ego action.

11        THE COURT:  The thing is, let us suppose they find

12   something in California or the Cayman Islands or somewhere.

13   So, they go to the court in California or the Cayman Islands or

14   Spain or wherever, and they sue BCRA.  Then they say BCRA, this

15   asset, this account should be available to help pay the

16   judgment debt because the judgment debt, of course, is the debt

17   of Argentina, but for the purpose of dealing with this asset,

18   you should consider BCRA the alter ego of the republic.

19        That's really what I did with the federal reserve

20   situation; and the Court of Appeals didn't disturb it for that

21   reason.  But the thing is, what the plaintiffs are saying is,

22   they should have available to them the findings of this Court

23   memorialized in a formal way so that they don't have to go

24   around and start anew this idea of the alter ego situation.

25        In other words, right now what exists is my finding

**SPA-22**

D9pgnmlc

1  and holding in the federal reserve situation which is not now a
2  formal judgment.  They're trying to get a formal declaration
3  which they can say represents the formal declaration of the
4  Southern District of New York.  They'd like to have it embodied
5  in a judgment, in a declaration which doesn't exist right now.
6              MR. NEUHAUS:  Your Honor, that's a very different
7  beast than what they have now because there's been no trial.
8  There's been no evidence.  Everything was based on newspaper
9  articles.  So, you're talking about an immense proceeding to
10 examine individuals.
11             THE COURT:  I don't think it's such an immense
12 proceeding at all.
13             MR. NEUHAUS:  Your Honor, you have to get testimony.
14             THE COURT:  What would be so immense about it?
15             MR. NEUHAUS:  They challenge decisions about whether
16 to increase reserves at a particular time.  We have offered
17 evidence in our papers here that says that was in response to a
18 fluctuation in exchange rates.  They say it was at the command
19 of the president at that time.
20             THE COURT:  All they're saying is we ask the Court not
21 to dismiss this case.
22             Actually, they're not asking at this moment for a
23 judgment.  Right?
24             MR. COHEN:  That's correct.
25             MR. NEUHAUS:  That's correct.  This is a motion to
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212)805-0300

**SPA-23**

D9pgnmlc

1  dismiss.
2           THE COURT:  And you're opposing the motion to dismiss,
3  but you're not asking for an affirmative judgment on this
4  motion.
5           MR. COHEN:  That's correct, just to be able to pursue
6  the action; that's all we're asking for.
7           MR. RIVKIN:  And obtain the discovery to prove the
8  points that Mr. Neuhaus says we can't prove.  Once again,
9  Argentina is trying to cut us off from the legitimate processes
10 of these courts to inquire into their actions.
11          THE COURT:  Trying to cut off what?
12          MR. RIVKIN:  Trying to cut off discovery, trying to
13 cut off an inquiry.  Mr. Neuhaus raises a specter of a trial on
14 the alter ego action.
15          THE COURT:  I'm sorry.  I missed your name.
16          MR. RIVKIN:  David Rivkin, again, for EML.
17          My point was, what Mr. Neuhaus was saying by trying to
18 raise a false specter, as you said, of a massive trial on the
19 alter ego issue is, once again, cut us off from the legitimate
20 processes of this Court.
21          We have a right to be able to pursue our claim that
22 it's an alter ego and producing the evidence and convincing you
23 of that finding eventually and to enter a different kind of
24 declaratory judgment.  But what Mr. Neuhaus is saying is we're
25 not going to be able to prove it.  It's going to be a big
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212)805-0300

# SPA-24

D9pgnmlc

1  trial.  That's not what one decides on a motion to dismiss.
2          MR. NEUHAUS:  The reason I was mentioning that is that
3  is why declaratory judgments are not used to set up findings
4  that can be used in other proceedings.  Declaratory judgments
5  are supposed to end litigation, end disputes.
6          MR. COHEN:  Can I respond to that one point?
7          THE COURT:  What you really will not reckon with is
8  the peculiar circumstances of this litigation.  What you've
9  said might apply to some simple, straight-forward litigation,
10  but this is not what we have here.
11          You are now entering into the arena, and you've been
12  here before, of a very unusual litigation which is caused by
13  the republic.  The extraordinary length and difficulty of all
14  of this is caused by the republic's failure, intentional
15  failure, to pay its just debts.
16          We don't have a standard, simple, straight-forward,
17  nice, easy kind of litigation that you're talking about.  We've
18  got a different animal.
19          Now, let me ask this:  Is there anything in the
20  Foreign Sovereign Immunities Act which requires dismissal of
21  this action, Mr. Cohen?
22          MR. COHEN:  No, your Honor.
23          MR. NEUHAUS:  I take it that's a question more to me.
24          THE COURT:  I'll take an answer from anybody.
25          MR. NEUHAUS:  The answer is yes, your Honor.  The
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212)805-0300

**SPA-25**

D9pgnmlc
1  Foreign Sovereign Immunities Act does not permit this action to
2  go forward.  They have to find an exception to the immunity of
3  the central bank.
4          They have argued two exceptions, your Honor:  One is
5  waiver by the republic, not by the central bank; and the other
6  is commercial activities that are the basis, they claim, of the
7  alter ego action.
8          On the first, waiver, your Honor, the Second Circuit
9  in its opinion in this case in 2011 squarely held that the
10 republic's waiver does not extend to the BCRA, even assuming
11 that the alter ego was established.
12         THE COURT:  That was in applying 1611.
13         MR. COHEN:  1611.
14         MR. NEUHAUS:  But the Second Circuit in that decision
15 very clearly relied on waiver decisions from 1605, the section
16 that's at issue here, so the test is the same.  Just because
17 you're an alter ego does not mean that the waiver that the
18 republic gave in 1994, long before any alter ego relationship
19 is said to have arisen, applies to the bank.
20         The cases that they rely on in this case are all cases
21 in which the controlled entity was acting as an agent in giving
22 the waiver, in doing the activity at issue.  That's not the
23 case here.
24         Here, the alter ego evidence starts in 2001 when all
25 the turnover in directors and the governors of the bank is
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212)805-0300

**SPA-26**

D9pgnmlc

1    alleged to have started.  The waiver was given in 1994.  The
2    waiver is not a product of control by the republic on these
3    allegations.

4            The Second Circuit didn't say because they're an alter
5    ego, the republic's waiver applies to the bank.  The Second
6    Circuit said, no, the waiver doesn't mention the bank;
7    therefore, it doesn't apply.  And there's been no waiver of
8    immunity under the Foreign Sovereign Immunities Act.  So, the
9    waiver, your Honor, doesn't work.

10           The second basis that they argue for jurisdiction
11   under the Foreign Sovereign Immunities Act is that the
12   commercial activity in the United States is the heart of the
13   alter ego claims.  The Second Circuit requires a very close
14   connection between what they call the gravamen of the complaint
15   and the activities in the United States.

16           The gravamen of the complaint in this case is
17   the alleged control by Argentina of the bank, and again, across
18   the waterfront, across the entirety of its activities because
19   that's the test, that you have to have an overarching,
20   day-to-day control test.

21           So, the gravamen of the complaint is all about the
22   control exercised by Argentina over the bank, and all of that
23   happens in Argentina.  All of the alleged direction to
24   accumulate reserves or the directions alleged to lend money to
25   Argentina, all of that, the directions all occur in Argentina.

# SPA-27

D9pgnmlc

1        You can't just say, well, there's some link into the
2  United States.  There are other circuits that say as long as
3  one element of the cause of action occurs in the United States,
4  that is enough.  The Second Circuit has expressly rejected
5  those cases.  They rely on those cases from the Eighth and
6  Ninth Circuits, but the Second Circuit in a case called
7  Kensington v. Congo says no, it has to be the gravamen of the
8  complaint.
9        THE COURT:  Mr. Cohen, just start at the beginning.
10  The Foreign Sovereign Immunities Act exists.
11        MR. COHEN:  Yes, your Honor.
12        THE COURT:  BCRA is a foreign entity within the
13  meaning of the Foreign Sovereign Immunities Act.
14        MR. COHEN:  Yes.
15        THE COURT:  There's a special part of the statute that
16  deals with central banks, but aside from that, obviously, the
17  Republic of Argentina is a foreign sovereign within the meaning
18  of the Act.
19        MR. COHEN:  Yes.
20        THE COURT:  The BCRA is a foreign sovereign within the
21  meaning of the Act.  Just start at the basics.
22        How is there jurisdiction to bring this action against
23  the BCRA?  Go to the basics.
24        MR. COHEN:  Two grounds, your Honor.  Jurisdiction
25  immunity was waived in the FAA by Argentina.  And if BCRA is
            SOUTHERN DISTRICT REPORTERS, P.C.
               (212)805-0300

**SPA-28**

D9pgnmlc

1  the alter ego of Argentina, that waiver applies to BCRA.  Now,
2  that's law that has been around for a long time.  In fact, the
3  Kensington case that they cite which was before Judge Preska,
4  which I and Cleary were both involved in, found exactly that;
5  that a waiver by the sovereign waives the immunity for its
6  alter ego instrumentality.  And in that case, the Court found
7  that the state-owned oil company was the alter ego and that the
8  waiver in the applicable documents of immunity from
9  jurisdiction under the FSIA applied to that alter ego.
10         What Mr. Neuhaus is arguing is that that law has been
11  completely upset by the Second Circuit's ruling with respect to
12  the attachment.
13         Your Honor was exactly right:  All the Second Circuit
14  said was if you're applying 1611, we're going to look for an
15  explicit waiver with respect to central bank assets.  It
16  doesn't matter if it's alter ego.  It doesn't matter if it's
17  Argentina's money.  If it's used as a monetary authority, as a
18  central bank, and it's in the name of Argentina --
19         THE COURT:  You're not now suing under 1611.
20         MR. COHEN:  Not at all, your Honor.
21         THE COURT:  You're suing under the basic.
22         MR. COHEN:  Jurisdiction, waiver, breach of contract
23  and they're liable for it.
24         THE COURT:  The Section being 1605.
25         MR. COHEN:  1605, your Honor.
                  SOUTHERN DISTRICT REPORTERS, P.C.
                          (212)805-0300

# SPA-29

```
D9pgnmlc
```

1    Our second theory is that they have, the BCRA itself,
2  has engaged in commercial activity in this district, and it has
3  done that -- the gravamen argument, the nature of our claim,
4  the alter ego claim, I'm sorry, the declaratory judgment claim
5  has to arise out of the activity in the jurisdiction is exactly
6  right.
7    In the case that he cites, Kensington, the reason why
8  the court, the Second Circuit found that there wasn't
9  commercial activity here was because there was nothing that the
10  contract at issue there had to do with New York.
11    THE COURT: Start again.  I was looking at it.
12    MR. COHEN: Sure.
13    THE COURT: Start at the commercial activity
14  discussion again.
15    MR. COHEN: Yes.  The argument that Mr. Neuhaus has
16  made is that under the case called Kensington, the Second
17  Circuit found that the connection between this jurisdiction and
18  the claimed wrong was not close enough.  There wasn't enough in
19  New York to allow the commercial-activity-in-New-York exception
20  to apply and that's because there were oil transactions
21  happening around the world but not enough in New York.
22    Here, we have a claim for a breach of a fiscal agency
23  agreement governed by New York law, subject to jurisdiction in
24  New York, payable in New York, payable by a fiscal agent in New
25  York that is being breached, and payment to us is due in New

# SPA-30

```
      D9pgnmlc
1  York.
2              The gravamen of our complaint is that they should be
3  liable for that debt, the debt that results from the breach of
4  the contract that is focused in New York.
5              THE COURT:  The commercial activity by the republic.
6              MR. COHEN:  By BCRA in New York.  BCRA is acting in
7  New York to gather dollars that are used to repay debt to
8  others and not to us, and now, in violation of the contract --
9              THE COURT:  Where is it in the record that BCRA is
10  acting in New York?  Where is that in the record?
11             MR. COHEN:  The account at the Federal Reserve Bank,
12  your Honor.  They have had that account for forever and they
13  have it today.  And they still use it to gather dollars and
14  remit it to the BIS.
15             They have an account at the Federal Reserve Bank, and
16  they say that it's crucial that they have that account.  You
17  may remember back in 2010 we had an attachment again and they
18  said we can't do our business through BIS in Switzerland; we
19  need to have this account in New York in order to function.
20             So, there's no doubt that they are acting in New York
21  and that it's crucial to the way they function.  They need to
22  be able to move dollars on a regular basis in order to
23  function.
24             So, the connection between our case, the gravamen of
25  our claim, is that those activities by BCRA are crucial to the
```

# SPA-31

D9pgnmlc
1  perpetration of the fraud or injustice that is the alter ego
2  claim that we are asking you to decide.
3              We have jurisdiction, both on the waiver of immunity
4  that's imputed to BCRA and on BCRA's activities in this
5  jurisdiction which are the gravamen of our complaint.  So,
6  there's no doubt, in our view, that there is no basis to argue
7  that there is any FSIA immunity that applies here.
8              THE COURT:  I'm looking at 1605 now.  1605(a)(1) is
9  about waiver.  1605(2) is about commercial activity.
10             MR. COHEN:  We rely on both of those, your Honor.
11             You'll notice that in 1605(a)(1) which talks about
12  waiver, it says either explicitly or implicitly.  That's very
13  different than the explicit waiver that is required under 1611
14  and in certain other sections.  So, the jurisdictional waiver
15  can be implicit and has been interpreted to be applicable to
16  entities that are found to be alter egos of the sovereign.
17             THE COURT:  The thing that still concerns me, I
18  mentioned this at the outset, and it still concerns me about
19  the plaintiffs' position, is that a general declaration of
20  alter ego could really have effects or implications beyond what
21  I would intend.
22             Here's what I'm talking about:  I believe that there
23  could be some account or some assets of the BCRA which would be
24  legitimately attached or executed on to satisfy the judgment
25  debts here; and, on the other hand, the idea that BCRA is in a
                    SOUTHERN DISTRICT REPORTERS, P.C.
                             (212)805-0300

# SPA-32

```
D9pgnmlc
```

1  general way liable for the debts of the republic goes way too
2  far.
3           There certainly have been what I'll call
4  irregularities in the dealings between the republic and BCRA,
5  but everything is not irregular.  BCRA has legitimate functions
6  as far as the money supply of Argentina and so forth.  And the
7  assets of BCRA in a general way cannot, in my view, be said to
8  be applicable to the judgment debts of plaintiffs here.
9           But in view of the way the republic uses BCRA in what
10 I'll call an irregular way, the kind of thing I've talked about
11 in an earlier decision and you have enlarged upon in your
12 pleading here, it seems to me that there could very well be
13 some account or some asset which would legitimately apply to
14 the judgment debt here.
15          This arises, to some extent, from the way that the
16 republic uses BCRA in a way that departs from the way the Bank
17 of England would be used, or the Central Bank of Germany would
18 be used.  The republic does not do things in a regular way.
19          What I'm going to do this afternoon is to deny the
20 motions to dismiss the third-amended complaint.  I believe
21 there is jurisdiction in the way Mr. Cohen describes
22 jurisdiction which makes it appropriate to entertain the
23 action; and considering the provisions of the Foreign Sovereign
24 Immunities Act, I believe that there is an implied waiver here
25 and I believe there's commercial activity so that the

# SPA-33

```
D9pgnmlc
```

1    provisions of 28 U.S.C. 1605(a)(1) and (a)(2) are applicable.
2            This really is, denying a motion to dismiss, exactly
3    what would emerge from a litigation that has problems.  The
4    plaintiffs' position has problems, as I've indicated.  But I
5    think those problems do not require the dismissal of the
6    action.
7            And I want to repeat something which I'm sure I've
8    said maybe more than once this afternoon; and that is, we don't
9    have a republic which is acting in a normal way as far as its
10   debts.  We don't have a situation there is a completely regular
11   dealing between the republic and BCRA the way that I'm sure
12   would exist with the Bank of England or the Central Bank of
13   Germany or France or certainly with the Federal Reserve Bank.
14   We don't have that.  We have irregularities.
15           The reason that I believe the action should be held
16   open is I think there is a very legitimate claim by the
17   plaintiffs here that for certain purposes BCRA is the alter ego
18   of the republic.
19           In the papers before me, the plaintiffs have made a
20   very powerful case of that, and I so held in my earlier
21   decision, and that holding was not what was disturbed by the
22   Court of Appeals.  So, there's a very good case of alter ego.
23           I believe that the Court should entertain the idea
24   that it would be desirable to have this Court with its
25   experience in this case and its background in this case make

**SPA-34**

D9pgnmlc
1    some kind of a formal ruling of alter ego which could be
2    legitimately used in a proceeding in another state or a foreign
3    country so that the plaintiffs do not have to go to the other
4    state or the foreign country and start in again, once again,
5    and maybe more than once again with this presentation about
6    alter ego.
7            The motion to dismiss the action is denied.  And
8    that's all we can do this afternoon.  I'm sure that we'll
9    schedule further proceedings in an appropriate way.
10           Thank you.
11           (Adjourned)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

SOUTHERN DISTRICT REPORTERS, P.C.
(212)805-0300



**SPA-35**

28 U.S.C.A. § 1330

Page 1

**C**

**Effective:[See Text Amendments]**

United States Code Annotated Currentness
   Title 28. Judiciary and Judicial Procedure (Refs & Annos)
     Part IV. Jurisdiction and Venue (Refs & Annos)
       Chapter 85. District Courts; Jurisdiction (Refs & Annos)
         **§ 1330. Actions against foreign states**

**(a)** The district courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state as defined in section 1603(a) of this title as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605-1607 of this title or under any applicable international agreement.

**(b)** Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction under subsection (a) where service has been made under section 1608 of this title.

**(c)** For purposes of subsection (b), an appearance by a foreign state does not confer personal jurisdiction with respect to any claim for relief not arising out of any transaction or occurrence enumerated in sections 1605-1607 of this title.

CREDIT(S)

(Added Pub.L. 94-583, § 2(a), Oct. 21, 1976, 90 Stat. 2891.)

Current through P.L. 113-38 approved 9-30-13

Westlaw. (C) 2013 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT



**SPA-36**

**C**

**Effective:[See Text Amendments]**

United States Code Annotated Currentness
  Title 28. Judiciary and Judicial Procedure (Refs & Annos)
    Part IV. Jurisdiction and Venue (Refs & Annos)
      Chapter 97. Jurisdictional Immunities of Foreign States
        → → **§ 1602. Findings and declaration of purpose**

The Congress finds that the determination by United States courts of the claims of foreign states to immunity from the jurisdiction of such courts would serve the interests of justice and would protect the rights of both foreign states and litigants in United States courts. Under international law, states are not immune from the jurisdiction of foreign courts insofar as their commercial activities are concerned, and their commercial property may be levied upon for the satisfaction of judgments rendered against them in connection with their commercial activities. Claims of foreign states to immunity should henceforth be decided by courts of the United States and of the States in conformity with the principles set forth in this chapter.

CREDIT(S)

(Added Pub.L. 94-583, § 4(a), Oct. 21, 1976, 90 Stat. 2892.)

Current through P.L. 113-65 (excluding P.L. 113-54 and 113-59) approved 12-20-13

Westlaw. (C) 2014 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT



**C**

**Effective: February 18, 2005**

United States Code Annotated Currentness
   Title 28. Judiciary and Judicial Procedure (Refs & Annos)
      Part IV. Jurisdiction and Venue (Refs & Annos)
         Chapter 97. Jurisdictional Immunities of Foreign States
         ➡➡ **§ 1603. Definitions**

For purposes of this chapter--

**(a)** A "foreign state", except as used in section 1608 of this title, includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state as defined in subsection (b).

**(b)** An "agency or instrumentality of a foreign state" means any entity--

**(1)** which is a separate legal person, corporate or otherwise, and

**(2)** which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and

**(3)** which is neither a citizen of a State of the United States as defined in section 1332(c) and (e) of this title, nor created under the laws of any third country.

**(c)** The "United States" includes all territory and waters, continental or insular, subject to the jurisdiction of the United States.

**(d)** A "commercial activity" means either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose.

**(e)** A "commercial activity carried on in the United States by a foreign state" means commercial activity carried on by such state and having substantial contact with the United States.

CREDIT(S)

(Added Pub.L. 94-583, § 4(a), Oct. 21, 1976, 90 Stat. 2892; amended Pub.L. 109-2, § 4(b)(2), Feb. 18, 2005,

# SPA-38

119 Stat. 12.)

Current through P.L. 113-38 approved 9-30-13

Westlaw. (C) 2013 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.



**SPA-39**

**C**

**Effective:[See Text Amendments]**

United States Code Annotated Currentness
   Title 28. Judiciary and Judicial Procedure (Refs & Annos)
     Part IV. Jurisdiction and Venue (Refs & Annos)
       Chapter 97. Jurisdictional Immunities of Foreign States
        →→ **§ 1604. Immunity of a foreign state from jurisdiction**

Subject to existing international agreements to which the United States is a party at the time of enactment of this Act a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter.

CREDIT(S)

(Added Pub.L. 94-583, § 4(a), Oct. 21, 1976, 90 Stat. 2892.)

Current through P.L. 113-38 approved 9-30-13

Westlaw. (C) 2013 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT



**SPA-40**



**Effective: January 28, 2008**

United States Code Annotated Currentness
  Title 28. Judiciary and Judicial Procedure (Refs & Annos)
    Part IV. Jurisdiction and Venue (Refs & Annos)
      Chapter 97. Jurisdictional Immunities of Foreign States
        **§ 1605. General exceptions to the jurisdictional immunity of a foreign state**

**(a)** A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case--

**(1)** in which the foreign state has waived its immunity either explicitly or by implication, notwithstanding any withdrawal of the waiver which the foreign state may purport to effect except in accordance with the terms of the waiver;

**(2)** in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States;

**(3)** in which rights in property taken in violation of international law are in issue and that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state; or that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States;

**(4)** in which rights in property in the United States acquired by succession or gift or rights in immovable property situated in the United States are in issue;

**(5)** not otherwise encompassed in paragraph (2) above, in which money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment; except this paragraph shall not apply to--

**(A)** any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion be abused, or

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(B)** any claim arising out of malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights; or

**(6)** in which the action is brought, either to enforce an agreement made by the foreign state with or for the benefit of a private party to submit to arbitration all or any differences which have arisen or which may arise between the parties with respect to a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration under the laws of the United States, or to confirm an award made pursuant to such an agreement to arbitrate, if (A) the arbitration takes place or is intended to take place in the United States, (B) the agreement or award is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards, (C) the underlying claim, save for the agreement to arbitrate, could have been brought in a United States court under this section or section 1607, or (D) paragraph (1) of this subsection is otherwise applicable.

**(7)** Repealed. Pub.L. 110-181, Div. A, § 1083(b)(1)(A)(iii), Jan. 28, 2008, 122 Stat. 341

**(b)** A foreign state shall not be immune from the jurisdiction of the courts of the United States in any case in which a suit in admiralty is brought to enforce a maritime lien against a vessel or cargo of the foreign state, which maritime lien is based upon a commercial activity of the foreign state: *Provided*, That--

**(1)** notice of the suit is given by delivery of a copy of the summons and of the complaint to the person, or his agent, having possession of the vessel or cargo against which the maritime lien is asserted; and if the vessel or cargo is arrested pursuant to process obtained on behalf of the party bringing the suit, the service of process of arrest shall be deemed to constitute valid delivery of such notice, but the party bringing the suit shall be liable for any damages sustained by the foreign state as a result of the arrest if the party bringing the suit had actual or constructive knowledge that the vessel or cargo of a foreign state was involved; and

**(2)** notice to the foreign state of the commencement of suit as provided in section 1608 of this title is initiated within ten days either of the delivery of notice as provided in paragraph (1) of this subsection or, in the case of a party who was unaware that the vessel or cargo of a foreign state was involved, of the date such party determined the existence of the foreign state's interest.

**(c)** Whenever notice is delivered under subsection (b)(1), the suit to enforce a maritime lien shall thereafter proceed and shall be heard and determined according to the principles of law and rules of practice of suits in rem whenever it appears that, had the vessel been privately owned and possessed, a suit in rem might have been maintained. A decree against the foreign state may include costs of the suit and, if the decree is for a money judgment, interest as ordered by the court, except that the court may not award judgment against the foreign state in an amount greater than the value of the vessel or cargo upon which the maritime lien arose. Such value shall be determined as of the time notice is served under subsection (b)(1). Decrees shall be subject to appeal and revision as provided in other cases of admiralty and maritime jurisdiction. Nothing shall preclude the plaintiff in any proper case from seeking relief in personam in the same action brought to enforce a maritime lien as provided in this section.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(d)** A foreign state shall not be immune from the jurisdiction of the courts of the United States in any action brought to foreclose a preferred mortgage, as defined in section 31301 of title 46. Such action shall be brought, heard, and determined in accordance with the provisions of chapter 313 of title 46 and in accordance with the principles of law and rules of practice of suits in rem, whenever it appears that had the vessel been privately owned and possessed a suit in rem might have been maintained.

**(e), (f)** Repealed. Pub.L. 110-181, Div. A, Title X, § 1083(b)(1)(B), Jan. 28, 2008, 122 Stat. 341

**(g) Limitation on discovery.--**

**(1) In general.--(A)** Subject to paragraph (2), if an action is filed that would otherwise be barred by section 1604, but for section 1605A, the court, upon request of the Attorney General, shall stay any request, demand, or order for discovery on the United States that the Attorney General certifies would significantly interfere with a criminal investigation or prosecution, or a national security operation, related to the incident that gave rise to the cause of action, until such time as the Attorney General advises the court that such request, demand, or order will no longer so interfere.

**(B)** A stay under this paragraph shall be in effect during the 12-month period beginning on the date on which the court issues the order to stay discovery. The court shall renew the order to stay discovery for additional 12-month periods upon motion by the United States if the Attorney General certifies that discovery would significantly interfere with a criminal investigation or prosecution, or a national security operation, related to the incident that gave rise to the cause of action.

**(2) Sunset.--(A)** Subject to subparagraph (B), no stay shall be granted or continued in effect under paragraph (1) after the date that is 10 years after the date on which the incident that gave rise to the cause of action occurred.

**(B)** After the period referred to in subparagraph (A), the court, upon request of the Attorney General, may stay any request, demand, or order for discovery on the United States that the court finds a substantial likelihood would--

**(i)** create a serious threat of death or serious bodily injury to any person;

**(ii)** adversely affect the ability of the United States to work in cooperation with foreign and international law enforcement agencies in investigating violations of United States law; or

**(iii)** obstruct the criminal case related to the incident that gave rise to the cause of action or undermine the potential for a conviction in such case.

**(3) Evaluation of evidence.--**The court's evaluation of any request for a stay under this subsection filed by the Attorney General shall be conducted ex parte and in camera.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

# SPA-43

**(4) Bar on motions to dismiss.**--A stay of discovery under this subsection shall constitute a bar to the granting of a motion to dismiss under rules 12(b)(6) and 56 of the Federal Rules of Civil Procedure.

**(5) Construction.**--Nothing in this subsection shall prevent the United States from seeking protective orders or asserting privileges ordinarily available to the United States.

CREDIT(S)

(Added Pub.L. 94-583, § 4(a), Oct. 21, 1976, 90 Stat. 2892; amended Pub.L. 100-640, § 1, Nov. 9, 1988, 102 Stat. 3333; Pub.L. 100-669, § 2, Nov. 16, 1988, 102 Stat. 3969; Pub.L. 101-650, Title III, § 325(b)(8), Dec. 1, 1990, 104 Stat. 5121; Pub.L. 104-132, Title II, § 221(a), Apr. 24, 1996, 110 Stat. 1241; Pub.L. 105-11, Apr. 25, 1997, 111 Stat. 22; Pub.L. 107-77, Title VI, § 626(c), Nov. 28, 2001, 115 Stat. 803; Pub.L. 107-117, Div. B, Ch. 2, § 208, Jan. 10, 2002, 115 Stat. 2299; Pub.L. 109-304, § 17(f)(2), Oct. 6, 2006, 120 Stat. 1708; Pub.L. 110-181, Title X, § 1083(b)(1), Jan. 28, 2008, 122 Stat. 341.)

Current through P.L. 113-38 approved 9-30-13

Westlaw. (C) 2013 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Govt. Works.



**SPA-44**



**Effective: August 10, 2012**

United States Code Annotated Currentness
   Title 28. Judiciary and Judicial Procedure (Refs & Annos)
      Part IV. Jurisdiction and Venue (Refs & Annos)
         Chapter 97. Jurisdictional Immunities of Foreign States
            **§ 1610. Exceptions to the immunity from attachment or execution**

**(a)** The property in the United States of a foreign state, as defined in section 1603(a) of this chapter, used for a commercial activity in the United States, shall not be immune from attachment in aid of execution, or from execution, upon a judgment entered by a court of the United States or of a State after the effective date of this Act, if--

   **(1)** the foreign state has waived its immunity from attachment in aid of execution or from execution either explicitly or by implication, notwithstanding any withdrawal of the waiver the foreign state may purport to effect except in accordance with the terms of the waiver, or

   **(2)** the property is or was used for the commercial activity upon which the claim is based, or

   **(3)** the execution relates to a judgment establishing rights in property which has been taken in violation of international law or which has been exchanged for property taken in violation of international law, or

   **(4)** the execution relates to a judgment establishing rights in property--

      **(A)** which is acquired by succession or gift, or

      **(B)** which is immovable and situated in the United States: *Provided*, That such property is not used for purposes of maintaining a diplomatic or consular mission or the residence of the Chief of such mission, or

   **(5)** the property consists of any contractual obligation or any proceeds from such a contractual obligation to indemnify or hold harmless the foreign state or its employees under a policy of automobile or other liability or casualty insurance covering the claim which merged into the judgment, or

   **(6)** the judgment is based on an order confirming an arbitral award rendered against the foreign state, provided that attachment in aid of execution, or execution, would not be inconsistent with any provision in the arbitral agreement, or

# SPA-45

**(7)** the judgment relates to a claim for which the foreign state is not immune under section 1605A or section 1605(a)(7) (as such section was in effect on January 27, 2008), regardless of whether the property is or was involved with the act upon which the claim is based.

**(b)** In addition to subsection (a), any property in the United States of an agency or instrumentality of a foreign state engaged in commercial activity in the United States shall not be immune from attachment in aid of execution, or from execution, upon a judgment entered by a court of the United States or of a State after the effective date of this Act, if--

**(1)** the agency or instrumentality has waived its immunity from attachment in aid of execution or from execution either explicitly or implicitly, notwithstanding any withdrawal of the waiver the agency or instrumentality may purport to effect except in accordance with the terms of the waiver, or

**(2)** the judgment relates to a claim for which the agency or instrumentality is not immune by virtue of section 1605(a) (2), (3), or (5) or 1605(b) of this chapter, regardless of whether the property is or was involved in the act upon which the claim is based, or

**(3)** the judgment relates to a claim for which the agency or instrumentality is not immune by virtue of section 1605A of this chapter or section 1605(a)(7) of this chapter (as such section was in effect on January 27, 2008), regardless of whether the property is or was involved in the act upon which the claim is based.

**(c)** No attachment or execution referred to in subsections (a) and (b) of this section shall be permitted until the court has ordered such attachment and execution after having determined that a reasonable period of time has elapsed following the entry of judgment and the giving of any notice required under section 1608(e) of this chapter.

**(d)** The property of a foreign state, as defined in section 1603(a) of this chapter, used for a commercial activity in the United States, shall not be immune from attachment prior to the entry of judgment in any action brought in a court of the United States or of a State, or prior to the elapse of the period of time provided in subsection (c) of this section, if--

**(1)** the foreign state has explicitly waived its immunity from attachment prior to judgment, notwithstanding any withdrawal of the waiver the foreign state may purport to effect except in accordance with the terms of the waiver, and

**(2)** the purpose of the attachment is to secure satisfaction of a judgment that has been or may ultimately be entered against the foreign state, and not to obtain jurisdiction.

**(e)** The vessels of a foreign state shall not be immune from arrest in rem, interlocutory sale, and execution in actions brought to foreclose a preferred mortgage as provided in section 1605(d).

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

**SPA-46**

**(f)(1)(A)** Notwithstanding any other provision of law, including but not limited to section 208(f) of the Foreign Missions Act (22 U.S.C. 4308(f)), and except as provided in subparagraph (B), any property with respect to which financial transactions are prohibited or regulated pursuant to section 5(b) of the Trading with the Enemy Act (50 U.S.C. App. 5(b)), section 620(a) of the Foreign Assistance Act of 1961 (22 U.S.C. 2370(a)), sections 202 and 203 of the International Emergency Economic Powers Act (50 U.S.C. 1701-1702), or any other proclamation, order, regulation, or license issued pursuant thereto, shall be subject to execution or attachment in aid of execution of any judgment relating to a claim for which a foreign state (including any agency or instrumentality or such state) claiming such property is not immune under section 1605(a)(7) (as in effect before the enactment of section 1605A) or section 1605A.

**(B)** Subparagraph (A) shall not apply if, at the time the property is expropriated or seized by the foreign state, the property has been held in title by a natural person or, if held in trust, has been held for the benefit of a natural person or persons.

**(2)(A)** At the request of any party in whose favor a judgment has been issued with respect to a claim for which the foreign state is not immune under section 1605(a)(7) (as in effect before the enactment of section 1605A) or section 1605A, the Secretary of the Treasury and the Secretary of State should make every effort to fully, promptly, and effectively assist any judgment creditor or any court that has issued any such judgment in identifying, locating, and executing against the property of that foreign state or any agency or instrumentality of such state.

**(B)** In providing such assistance, the Secretaries--

  **(i)** may provide such information to the court under seal; and

  **(ii)** should make every effort to provide the information in a manner sufficient to allow the court to direct the United States Marshall's office to promptly and effectively execute against that property.

**(3) Waiver.**--The President may waive any provision of paragraph (1) in the interest of national security.

**(g) Property in certain actions.**--

  **(1) In general.**--Subject to paragraph (3), the property of a foreign state against which a judgment is entered under section 1605A, and the property of an agency or instrumentality of such a state, including property that is a separate juridical entity or is an interest held directly or indirectly in a separate juridical entity, is subject to attachment in aid of execution, and execution, upon that judgment as provided in this section, regardless of--

    **(A)** the level of economic control over the property by the government of the foreign state;

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(B)** whether the profits of the property go to that government;

**(C)** the degree to which officials of that government manage the property or otherwise control its daily affairs;

**(D)** whether that government is the sole beneficiary in interest of the property; or

**(E)** whether establishing the property as a separate entity would entitle the foreign state to benefits in United States courts while avoiding its obligations.

**(2) United States sovereign immunity inapplicable.**--Any property of a foreign state, or agency or instrumentality of a foreign state, to which paragraph (1) applies shall not be immune from attachment in aid of execution, or execution, upon a judgment entered under section 1605A because the property is regulated by the United States Government by reason of action taken against that foreign state under the Trading With the Enemy Act or the International Emergency Economic Powers Act.

**(3) Third-party joint property holders.**--Nothing in this subsection shall be construed to supersede the authority of a court to prevent appropriately the impairment of an interest held by a person who is not liable in the action giving rise to a judgment in property subject to attachment in aid of execution, or execution, upon such judgment.

CREDIT(S)

(Added Pub.L. 94-583, § 4(a), Oct. 21, 1976, 90 Stat. 2896; amended Pub.L. 100-640, § 2, Nov. 9, 1988, 102 Stat. 3333; Pub.L. 100-669, § 3, Nov. 16, 1988, 102 Stat. 3969; Pub.L. 101-650, Title III, § 325(b)(9), Dec. 1, 1990, 104 Stat. 5121; Pub.L. 104-132, Title II, § 221(b), Apr. 24, 1996, 110 Stat. 1243; Pub.L. 105-277, Div. A, § 101(h) [Title I, § 117(a)], Oct. 21, 1998, 112 Stat. 2681-491; Pub.L. 106-386, Div. C, § 2002(g)(1), Oct. 28, 2000, 114 Stat. 1543; Pub.L. 107-297, Title II, § 201(c)(3), Nov. 26, 2002, 116 Stat. 2337; Pub.L. 110-181, Div. A, Title X, § 1083(b)(3), Jan. 28, 2008, 122 Stat. 341; Pub.L. 112-158, Title V, § 502(e)(1), Aug. 10, 2012, 126 Stat. 1260.)

Current through P.L. 113-65 (excluding P.L. 113-54 and 113-59) approved 12-20-13

Westlaw. (C) 2014 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT



**SPA-48**



**Effective: August 1, 1996**

United States Code Annotated Currentness
  Title 28. Judiciary and Judicial Procedure (Refs & Annos)
    Part IV. Jurisdiction and Venue (Refs & Annos)
      Chapter 97. Jurisdictional Immunities of Foreign States
        **§ 1611. Certain types of property immune from execution**

**(a)** Notwithstanding the provisions of section 1610 of this chapter, the property of those organizations designated by the President as being entitled to enjoy the privileges, exemptions, and immunities provided by the International Organizations Immunities Act shall not be subject to attachment or any other judicial process impeding the disbursement of funds to, or on the order of, a foreign state as the result of an action brought in the courts of the United States or of the States.

**(b)** Notwithstanding the provisions of section 1610 of this chapter, the property of a foreign state shall be immune from attachment and from execution, if--

  **(1)** the property is that of a foreign central bank or monetary authority held for its own account, unless such bank or authority, or its parent foreign government, has explicitly waived its immunity from attachment in aid of execution, or from execution, notwithstanding any withdrawal of the waiver which the bank, authority or government may purport to effect except in accordance with the terms of the waiver; or

  **(2)** the property is, or is intended to be, used in connection with a military activity and

    **(A)** is of a military character, or

    **(B)** is under the control of a military authority or defense agency.

**(c)** Notwithstanding the provisions of section 1610 of this chapter, the property of a foreign state shall be immune from attachment and from execution in an action brought under section 302 of the Cuban Liberty and Democratic Solidarity (LIBERTAD) Act of 1996 to the extent that the property is a facility or installation used by an accredited diplomatic mission for official purposes.

CREDIT(S)

(Added Pub.L. 94-583, § 4(a), Oct. 21, 1976, 90 Stat. 2897; amended Pub.L. 104-114, Title III, § 302(e), Mar.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 13-3819, Document 71, 01/15/2014, 1135183, Page 120 of 124

**SPA-49**

12, 1996, 110 Stat. 818.)

Current through P.L. 113-38 approved 9-30-13

Westlaw. (C) 2013 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.



**SPA-50**



**Effective: March 23, 2010**

United States Code Annotated Currentness
  Title 28. Judiciary and Judicial Procedure (Refs & Annos)
    Part VI. Particular Proceedings
      Chapter 151. Declaratory Judgments (Refs & Annos)
        →→ **§ 2201. Creation of remedy**

**(a)** In a case of actual controversy within its jurisdiction, except with respect to Federal taxes other than actions brought under section 7428 of the Internal Revenue Code of 1986, a proceeding under section 505 or 1146 of title 11, or in any civil action involving an antidumping or countervailing duty proceeding regarding a class or kind of merchandise of a free trade area country (as defined in section 516A(f)(10) of the Tariff Act of 1930), as determined by the administering authority, any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

**(b)** For limitations on actions brought with respect to drug patents see section 505 or 512 of the Federal Food, Drug, and Cosmetic Act, or section 351 of the Public Health Service Act.

CREDIT(S)

(June 25, 1948, c. 646, 62 Stat. 964; May 24, 1949, c. 139, § 111, 63 Stat. 105; Aug. 28, 1954, c. 1033, 68 Stat. 890; July 7, 1958, Pub.L. 85-508, § 12(p), 72 Stat. 349; Oct. 4, 1976, Pub.L. 94-455, Title XIII, § 1306(b)(8), 90 Stat. 1719; Nov. 6, 1978, Pub.L. 95-598, Title II, § 249, 92 Stat. 2672; Sept. 24, 1984, Pub.L. 98-417, Title I, § 106, 98 Stat. 1597; Sept. 28, 1988, Pub.L. 100-449, Title IV, § 402(c), 102 Stat. 1884; Nov. 16, 1988, Pub.L. 100-670, Title I, § 107(b), 102 Stat. 3984; Dec. 8, 1993, Pub.L. 103-182, Title IV, § 414(b), 107 Stat. 2147; Mar. 23, 2010, Pub.L. 111-148, Title VII, § 7002(c)(2), 124 Stat. 816.)

TERMINATION OF AMENDMENT

    <For termination of amendment by section 501(c) of Pub.L. 100-449, see Sunset Provisions note set out under this section..>

Current through P.L. 113-38 approved 9-30-13

Westlaw. (C) 2013 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

Case 13-3819, Document 71, 01/15/2014, 1135183, Page 122 of 124

**SPA-51**

END OF DOCUMENT



**SPA-52**

C

**Effective:[See Text Amendments]**

United States Code Annotated Currentness
  Title 28. Judiciary and Judicial Procedure (Refs & Annos)
    Part VI. Particular Proceedings
      Chapter 151. Declaratory Judgments (Refs & Annos)
        → → **§ 2202. Further relief**

Further necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment.

CREDIT(S)

(June 25, 1948, c. 646, 62 Stat. 964.)

Current through P.L. 113-38 approved 9-30-13

Westlaw. (C) 2013 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.



**SPA-53**

**C**

United States Code Annotated Currentness
   Constitution of the United States
      Annotated
         Article III. The Judiciary (Refs & Annos)
         ➡ **Section 2, Clause 1. Jurisdiction of Courts**

            <Notes of Decisions for Constitution Art. III, § 2, cl. 1, Jurisdiction of Courts, are displayed in two separate documents. Notes of Decisions for subdivisions I to VII are contained in this document. For Notes of Decisions for subdivisions VIII to end, see second document for Constitution Art. III, § 2, cl. 1, Jurisdiction of Courts.>

**Section 2.** The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority;--to all Cases affecting Ambassadors, other public Ministers and Consuls;--to all Cases of admiralty and maritime Jurisdiction;--to Controversies to which the United States shall be a Party;--to Controversies between two or more States;--between a State and Citizens of another State;--between Citizens of different States;--between Citizens of the same State claiming Lands under Grants of different States, and between a State, or the Citizens thereof, and foreign States, Citizens or Subjects.

Current through P.L. 113-65 (excluding P.L. 113-54 and 113-59) approved 12-20-13

Westlaw. (C) 2014 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT